**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION AT MEMPHIS**

| | | |
|---|---|---|
| **TONY VON CARRUTHERS,** | ) | |
| | ) | **EXECUTION SET:** |
| Petitioner, | ) | **MAY 21, 2026** |
| | ) | |
| **v.** | ) | **No. 2:08-CV-02425-TLP-cgc** |
| | ) | |
| **KENNETH NELSEN, Warden** | ) | |
| | ) | **CAPITAL CASE** |
| Respondent. | ) | |

**ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

Over thirty years ago, Tony Von Carruthers and two other men murdered Marcellos "Cello" Anderson, his mother Delois Anderson, and Freddrick Tucker.[1]  They shot both men, bound all three victims, and buried them in an empty grave at a Memphis cemetery.  The State's expert opined at trial that all three victims were buried alive.  Carruthers planned the murders for months and discussed his plans with others.  He later confessed the murders to fellow inmate, Alfredo Shaw, who relayed the confession to police.  After a trial, the jury sentenced him to death on three convictions for first-degree murder.  *State v. Carruthers*, 35 S.W.3d 516, 524-32 (Tenn. 2000), *cert. denied*, 533 U.S. 953 (2001).

The Tennessee Supreme Court affirmed Carruthers's convictions and death sentence on the strength of several aggravating factors, noting that "[t]hese murders were committed in a particularly cruel manner, and the proof indicates that the victims were maliciously mistreated before they were buried alive."  *Id.* at 570, 572.  Many years later, Carruthers completed the exhaustive three-tier review process—direct review, state post-conviction review, and federal habeas review—when the Supreme Court denied review of his unsuccessful federal habeas bid. *Carruthers v. Mays*, 586 U.S. 1146 (2019).

The Tennessee Supreme Court then set Carruthers's execution date for May 21, 2026, and remanded to the trial court for consideration of his ripened claim that he is not competent for execution.  *State v. Carruthers*, No. W1997-00097-SC-DDT-DD (Tenn. Sept. 30, 2026) (order setting execution for May 21, 2026).  The factual issue embedded with the mixed question of

---

[1] Throughout the litigation of this case, court records have misspelled Mr. Tucker's first name as "Frederick."  Mr. Tucker's family recently provided the State with the correct spelling, which Respondent now uses in respect of the victim and his family.

competency for execution is whether Carruthers has "a rational understanding of the reason for [his] execution." *Panetti v. Quarterman*, 551 U.S. 930, 957-58 (2007).

After a four-day hearing with eight witnesses and forty-six exhibits, the trial court denied Carruthers's incompetence claim through a straightforward and correct application of *Panetti*. (ECF No. 228-15, PageID 30958-79.)  Based in part on Carruthers's own testimony, the court found that Carruthers "has an awareness of and a rational understanding of his conviction" and his "impending execution" as well as a "rational understanding of the relationship between the conviction and the impending execution." (*Id.* at PageID 30979.)  The Tennessee Supreme Court affirmed, holding that the trial court "correctly applied the *Panetti* standard to the evidence" and that "the record fully supports and does not preponderate against the trial court's finding that Mr. Carruthers is presently competent to be executed." *Carruthers v. State*, ___ S.W.3d ___ , No. W1997-00097-SC-DDT-DD, 2026 WL 1257769, at *22 (Tenn. May 7, 2026) (for publication).

Less than six days before his scheduled execution—and more than eight days after the Tennessee Supreme Court affirmed his competency for execution—Carruthers filed a second petition for writ of habeas corpus claiming that he is incompetent for execution, as well as a related application for stay of execution. (ECF No. 225 & 226).  The state-court proceedings readily show that his competency claim is meritless and borders on frivolous.  After a four-day evidentiary hearing when Carruthers himself acknowledged his own rational understanding of why the State plans to execute him, he cannot now overcome the state-court factual finding, derived from this live testimony and other evidence, that he is not incompetent for execution under *Ford v. Wainright,* 477 U.S. 399 (1986), and its progeny.

More to the point, when rejecting his competency claim, the Tennessee Supreme Court reasonably applied governing federal law and reasonably determined the facts presented to it.

3

*Carruthers,* 2026 WL 1257769. The extensive testimony presented at the evidentiary hearing left no room for doubt that Carruthers has a "rational understanding of the reason for [his] execution." *Panetti,* 551 U.S. at 957-58.

Nevertheless, Carruthers challenges that state-court adjudication and seeks to avoid this Court's deferential review over the claim, as mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA), in two ways. First, he argues under 28 U.S.C. § 2254(d)(1) that the Tennessee Supreme Court unreasonably applied *Panetti* and *Ford* based upon a purportedly errant sentence used by the Tennessee Supreme Court when explaining *Panetti*. Second, he argues under 28 U.S.C. § 2254(d)(2) that, because of that same sentence, the Tennessee Supreme Court "distorted [*Panetti*'s] understanding and led to an unreasonable determination of the facts." (ECF No. 225, PageID 20503-11, 20511-14.)

Despite his best effort, Carruthers cannot avoid AEDPA's deferential review by flyspecking the Tennessee Supreme Court's opinion in this way. He cannot show that the Tennessee Supreme Court unreasonably applied federal law or unreasonably determined the facts. The trial court correctly concluded that Carruthers failed to prove by a preponderance of the evidence that he is incompetent to be executed. Applying *Ford*, *Panetti*, and *Madison v. Alabama,* 586 U.S. 265 (2019), the Tennessee Supreme Court rightly affirmed the trial court's decision. A fairminded jurist could resolve Carruthers's competency claim as that court did, meaning that the state court reasonably applied federal law. And the state-court record does not compel any factual finding contrary to that found by the state court, meaning that the state court reasonably determined the facts. Carruthers's competency claim lacks merit, and the Court should deny the petition.

### STATEMENT OF THE CASE AND FACTS

A.      **Legal Background**

    **1.   Challenging Competency for Execution Once Claim Ripens**

"[A]s a matter of constitutional law," *Ford v. Wainwright* "held 'a category of defendants defined by their mental state' incompetent to be executed." *Madison*, 586 U.S. at 268 (quoting *Ford*, 477 U.S. 399, 419 (1986) (plurality opinion)).  *Panetti* then left no room for doubt that "'sanity as a predicate to lawful execution'" involves a question of "'fact," specifically, whether a prisoner can "reach a rational understanding of the reason for [his] execution."  551 U.S. at 948-49 (quotation omitted).  The *Panetti* "standard for competency," *id* at 957, is "utterly indifferent to a prisoner's specific mental illness." *Madison*, 586 U.S. at 278.  It concerns "not the diagnosis of such illness, but a consequence—to wit, the prisoner's inability to rationally understand his punishment." *Id*.  "The critical question is whether a prisoner's mental state is so distorted ... that he lacks a rational understanding of the State's rationale for his execution." *Id*. at 269.  This particular "issue of sanity is properly considered in proximity to the execution." *Herrera v. Collins*, 506 U.S. 390, 406 (1993).

The Tennessee Supreme Court's opinion in *Van Tran v. State*, 6 S.W.3d 257 (Tenn. 1999), governs the procedure for deciding Tennessee prisoners' competency to be executed. *See* Tenn. Sup. Ct. R. 12(4)(A) (citing *Van Tran* in reference to proceedings on competency for execution).  Under that procedure, a prisoner may assert incompetence in response to the State's motion to set an execution date. *Van Tran*, 6 S.W.3d at 267.  Upon setting an execution date, the Tennessee Supreme Court remands to the trial court to adjudicate the competency claim. *Id*.

On remand, the prisoner must file a petition that "clearly set[s] forth the facts alleged to support the claim that execution should be stayed due to present mental incompetence." *Id*.  For

an evidentiary hearing, the prisoner must make a "threshold showing" of incompetency. *Id*. at 269. That is, the prisoner must submit "affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate that there exists a genuine question regarding petitioner's present competency." *Id*. Generally, this evidence "should be from psychiatrists, psychologists, or other mental health professionals." *Id*. "[T]he unsupported conclusory assertions of a family member of the prisoner or an attorney representing the prisoner will ordinarily be insufficient." *Id*. And "the proof required to meet the threshold showing must relate to present incompetency," so "at least some of the evidence submitted must be the result of recent mental evaluations or observations of the prisoner." *Id*. The threshold showing "cannot be satisfied if the only evidence offered is stale in the sense that it relates to the prisoner's distant past competency or incompetency." *Id*.

Even if a prisoner makes the threshold showing necessary to hold a hearing, he is presumed competent. *State v. Irick*, 320 S.W.3d 284, 292 (Tenn. 2010). To prevail, the prisoner must overcome this presumption by a preponderance of the evidence relating to present incompetence. *Id*.

The Tennessee Supreme Court "automatically review[s] decisions of the trial court in competency proceedings arising out of [an] order setting an execution date." *Van Tran*, 6 S.W.3d at 271-72. Questions of law, like "[p]rocedural issues," receive de novo review. *Id*. at 272. The trial court's finding on the issue of competency is "reviewed as a question of fact and presumed correct, unless the evidence in the record preponderates against the finding." *Id*. (citing Tenn. R. App. P. 13(d)).

The Sixth Circuit has upheld the adequacy of Tennessee's *Van Tran* procedures to assess competency for execution. *See Coe v. Bell*, 209 F.3d 815, 822 (6th Cir. 2000) ("[T]he procedures

identified in *Van Tran* are generally adequate to protect a prisoner's right to a fair hearing of his

*Ford* competency claim as required by due process."). After *Panetti*, the Tennessee Supreme

Court clarified that the *Panetti* standard for competency governs. *Irick*, 320 S.W.3d at 294-95.

Likewise, after *Madison*, the Tennessee Supreme Court recognized that the *Panetti* standard, as

modified by *Madison*, controls for an assessment of competency to be executed. *State v. Black*,

___ S.W.3d ___, No. M2000-00641-SC-DPE-CD, 2025 WL 1927568, at *5 (Tenn. July 8, 2025)

(for publication).

## 2. Deferential Federal Habeas Corpus Review

Pursuant to 28 U.S.C. § 2254(a), a person in custody as a result of a state-court conviction

may petition for a writ of habeas corpus relative to that custody "only on the ground that he is in

custody by violation of the Constitution or law or treaties of the United States." However, AEDPA

limits the availability of habeas corpus review "with respect to any claim" that a state court

"adjudicated on the merits." 28 U.S.C § 2254(d). This review centers on "the last state-court

adjudication on the merits of the petitioner's claim," *Brown v. Davenport,* 598 U.S. 118, 141

(2022) (cleaned up), and is limited to the record presented in state court. *Cullen v. Pinholster*, 563

U.S. 170, 181 (2011). Habeas corpus relief is available only when the state court's decision was

"so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington v. Ritcher*, 562 U.S. 86, 103

(2011).

Under AEDPA, a district court may not grant relief on a federal claim "adjudicated on the

merits in state court" unless the claim "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States" or "resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This "highly deferential standard" ensures that state-court decisions are "given the benefit of the doubt." *Woodford v. Viscotti,* 537 U.S. 19, 24 (2002) (cleaned up).

An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle in existence at the time" but "unreasonably applies that principle to the facts of the [petitioner's] case." *Pinholster*, 563 U.S. at 182 (cleaned up); *see also Richter*, 562 U.S. at 103. Review is limited to the record presented to the state court that resolved the claim. *Pinholster*, 563 U.S. at 181-83. The state court's ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald,* 575 US. 312, 316 (2015) (per curiam). The relevant inquiry "is not whether a federal court believes the state court's determination ... was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (cleaned up). This "highly deferential" review "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (cleaned up). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* 562 U.S. 86, 102 (2011).

As for an "unreasonable determination of facts in light of the evidence presented in the State court proceeding," 28 U.S.C § 2254(d)(2), "a state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow,* 571 U.S. 12, 18 (2013) (cleaned up). Instead, the record must "'*compel* the conclusion that the [state] court had no permissible alternative' but to arrive at the contrary conclusion." *Carter v. Bogan*, 900 F.3d 754, 768 (6th Cir. 2018) (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006) (emphasis added)). The reviewing federal court must accord the state

8

court "substantial deference." *Brumfield v. Cain*. 576 U.S. 305, 314 (2015). "[T]he question for this court to answer 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Hill v. Shoop*, 11 F.4th 373, 384 (6th Cir. 2021) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

With AEDPA deference, relief is unavailable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "If this rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision." *Mays v. Hines*, 592 U.S. 385, 391 (2021). And the federal court "may not flyspeck state-court opinions" when "[t]he goal is to protect against 'extreme malfunctions in the state criminal justice system,' not to create a grading system for state-court opinion writing." *Rogers v. Mays*, 69 F.4th 381, 391-92 (6th Cir. 2023) (cleaned up).

**B.      Factual Background**

**1.      Murder of Cello Anderson, Delois Anderson, and Freddrick Tucker**

In late February 1994, Tony Carruthers and two other men murdered Marcellos "Cello" Anderson, his mother Delois Anderson, and Freddrick Tucker. *Carruthers*, 35 S.W.3d at 524. The men shot Mr. Anderson and Mr. Tucker, beat and strangled Ms. Anderson, and buried all three victims with their hands bound behind their backs in an empty grave at a Memphis cemetery. *Id*. at 527. The State's expert opined that the victims were buried alive. *Id*. at 528. Their bodies were discovered in early March 1994. *Id*. at 527-28.

While incarcerated during the summer of 1993, Carruthers began broadcasting his plans to kidnap, rob, and murder Mr. Anderson. *Id*. at 524. He wrote a letter to Jimmy Lee Maze describing

a "master plan" that was a "winner." *Id*. He intended to "make those streets pay" him and told

Maze that "everything I do from now on will be well organized and extremely violent." *Id*. That

fall, while on a work detail assisting with a cemetery burial, Carruthers told fellow inmate Charles

Ray Smith that this "would be a good way, you know, to bury somebody, if you're going to kill

them." *Id*. He explained, "[I]f you ain't got no body, you don't have a case." *Id*. Smith also

heard Carruthers and his co-defendant, James Montgomery[2], discussing their plans to rob Mr.

Anderson because he had a lot of money through dealing drugs. *Id*.

A month after Carruthers's release from jail in November 1993, he told co-defendant

Jonathan Montgomery that when James was released from prison, "it would be the best time to

kidnap Marcellos." *Id*. at 525. James left prison in January 1994, and Carruthers executed his

plan in February. *Id*.

Multiple witnesses saw Carruthers and James with Mr. Anderson and Mr. Tucker on the

evening of February 23. *Id*. at 526. Nakeita Shaw told police that she saw Carruthers and James

lead Mr. Anderson and Mr. Tucker to a Jeep with their hands tied behind their backs. *Id*. Mr.

Anderson had recently borrowed a Jeep, which was later found destroyed by fire on February 25.

*Id*.

On the evening of February 24, Jonathan told Chris Hines that they had stolen $200,000

and had killed "Cello and them" "out at the cemetery on Elvis Presley." *Id*. Jonathan repeatedly

told Hines that "they had to kill some people." *Id*. at 527. On March 3, 1994, Jonathan led police

to a grave in the Rose Hill Cemetery on Elvis Presley Boulevard in Memphis where they found

the three victims' bodies buried under a casket *Id*. at 527 n.5. Though Mr. Anderson was known

---

[2] Because co-defendants James and Jonathan Montgomery share a surname, the respondent uses
their first names.

to wear "expensive jewelry ... [and] carr[y] large sums of money on his person," no money or jewelry was found with his body. *Id*. at 524.

After seeing a news report about the killings, Alfredo Shaw called a police tip line and later testified before the grand jury that "he had been on a three-way call with Carruthers" and another man and that "during this call, Carruthers had asked [Mr. Shaw] to participate in these murders, saying he had a 'sweet plan' and that they would each earn $100,000 and a kilogram of cocaine." *Id*. at 528-29.

Before trial, Mr. Shaw told media that he had lied to the grand jury about Carruthers's involvement in the murders. *Id*. at 528. But when Carruthers called Mr. Shaw as a trial witness, Mr. Shaw testified that he lied to the media because Carruthers had threatened him and his family. *Id*. at 528-29. Mr. Shaw further testified that Carruthers confessed to the murders while they were jailed together before Carruthers's trial. *Id*. at 529. Carruthers told Mr. Shaw that he used Ms. Anderson to lure Mr. Anderson and Mr. Tucker home. *Id*. Carruthers said he then shot two of the victims, burned the Jeep, stole a car to return to Memphis, and buried the victims alive. *Id*. According to Carruthers, Ms. Anderson began screaming as Mr. Anderson and Mr. Tucker were forced into the grave, and so Carruthers or a co-defendant pushed her into the grave too. *Id*. Carruthers lamented to Mr. Shaw that the bodies would never have been found if "'the boy wouldn't have went and told them folks.'" *Id*.

## C.    **Procedural Background**

### 1.    **Exhaustive Review of Carruthers' Death Sentence and Setting of Execution Date**

Following a jury trial, Carruthers was convicted on three counts of first-degree murder and several non-homicide offenses, and the jury imposed a sentence of death on each of his first-degree murder convictions. His convictions and sentences were affirmed on direct appeal. *Id.* at 572. He

then unsuccessfully pursued state post-conviction and federal habeas relief. *See Carruthers v. State,* No. W2006-00376-CCA-R3-PC, 2007 WL 4355481, at *1 (Tenn. Crim. App. Dec. 12, 2007) (affirming denial of post-conviction relief), *perm. app. denied* (Tenn. May 27, 2008); *Carruthers v. Mays,* 889 F.3d 273 (6th Cir. 2018), *cert. denied, Carruthers v. May,* 586 U.S. 1146 (2019) (affirming denial of federal habeas corpus relief).

In September 2019, following the conclusion of the three-tier review, the State filed a motion to set Carruthers's execution date in the Tennessee Supreme Court. *Carruthers,* 2026 WL 1257769, at *7 n.6. In his response, Carruthers invoked his claim of incompetency for execution. *Id.* at *7. On September 30, 2025, the Tennessee Supreme Court set Carruthers' execution for May 21, 2026, and remanded to the trial court for "competency proceedings . . . in accordance with the timeliness and procedures established in *Van Tran*." *Id.*

### 2.    Trial Court's Denial of Competency Petition

On remand, Carruthers filed a petition reasserting his incompetence for execution. He alleged he suffers from delusions due to brain damage and schizoaffective disorder, bipolar type that interferes with his ability to rationally understand the execution and the reasons for it. (ECF No. 227-5, PageID 20758-20801). His petition attached a February 2026 report from Dr. Bhushan Agharkar, a psychiatrist who evaluated and diagnosed Carruthers with schizoaffective disorder, bipolar type, in 2011 and then again in 2026, despite the fact that he was unable to conduct an in-person evaluation in 2026. (*Id.* PageID 20802-11.) Dr. Agharkar's report concluded "that Mr. Carruthers is not competent to be executed under the *Panetti* standard" due to his paranoia about evaluation, his "continued conviction that he will be released imminently, his paranoia regarding his attorneys, and his fixation on entitlement to payments for illogical and delusional claims to the

exclusion of concern regarding his execution." (*Id.* at PageID 20811.) The trial court concluded that Carruthers made a threshold showing for a hearing.

At the competency hearing, Carruthers presented testimony from several witnesses in an attempt to show that he is incompetent to be executed based upon certain purported "delusions." Specifically, he presented three of his former attorneys, the chief paralegal in his counsel's office, an out-of-state assistant federal public defender, his retained mental health expert, and his own testimony. *Carruthers,* 2026 WL 1257769, at \*9. The State presented testimony from its own retained mental health expert. *Id.* In total, the parties admitted forty-six exhibits into evidence. *Id.*

*First*, Carruthers called Attorney Richard Tennent, who represented Carruthers from 2018 through 2023. *Id.* at \*10. Tennent stated that his last contact with Carruthers was in 2023 and that, during his representation, he spoke with Carruthers approximately 75 times per year and visited with Carruthers twice in prison throughout the course of his representation. *Id.* Tennent prepared the response to the State's motion to set an execution date in 2019, which included an incompetency-to-be-executed claim. *Id.* Tennent explained that Carruthers was angry "with attorneys and experts who wanted to assess his ... competency" and claimed that he is not "mentally ill or incompetent." *Id.*[3]

Tennent provided his lay opinion that Carruthers "is fixated on multiple false beliefs or delusions." *Id.* Providing a few examples, Tennent opined that Carruthers "falsely believes he is entitled to significant compensation" for various attorney ethical violations in connection with his

---

[3] This is comparable to Carruthers's response in state court during the first round of post-conviction review after Carruthers's conviction was affirmed on direct appeal, when Carruthers objected to post-conviction review counsel's claim that Carruthers was not competent for trial. Upon a post-conviction competency assessment, Carruthers was declared competent to withdraw the competency-for-trial claim. *Carruthers*, 889 F.3d at 286-87.

case and that he is "fixated on Alfredo Shaw, a defense witness at trial who claimed Mr. Carruthers confessed to him in jail." *Id.* Tennent testified that Carruthers' beliefs about Shaw are "'far from delusional,'" explaining that Carruthers's counsel had put together what they and Carruthers referred to as a "'fraud upon the court' packet" relating to Shaw's role in Carruthers's case" *Id.* According to Tennent, Carruthers believed that those "responsible for the fraud would be arrested, and he would be released." *Id.* Tennant also testified that Carruthers "falsely believes" he is "entitled to significant compensation" for ethical violations based on Tennessee Rule of Professional Conduct 3.3 *Id.*

Tennant agreed that Carruthers has never disputed that he was convicted for the three murders. *Id.* Tennant also testified that although the beliefs Carruthers holds "are not true," there was a "'kernel of truth'" in Carruthers' beliefs. *Id.* In Tennent's words, Carruthers "thinks this is a 'giant farce' and that the death penalty is only being used to coerce him" into entering an *Alford* plea. *Id.* at *10-*11.

On recall, Tennent opined that Carruthers believes "all of the conspirators" "are desperately trying to avoid paying the $3.3 million owed to him and avoid losing their law licenses by forcing him take a plea." *Id.* at *16. Tennent acknowledged Carruthers' anger that his co-defendant "had taken an *Alford* plea after his conviction was overturned because he believed [his co-defendant] was innocent, and therefore, his plea was a fraud." *Id.* Tennent testified that the last time he heard Carruthers speak about an *Alford* plea was in 2021.[4] *Id.*

*Next,* Kelley Henry, another prior counsel for Carruthers, testified that she assumed representation of Carruthers in 2020 and remained on his case until 2025. *Id.* at *11. Henry

---

[4] Attorney Houston Goddard, whose representation overlapped with Tennent's, affirmed much of this testimony. *Id.* at *17.

14

testified that she only visited Carruthers once, to speak about the new lethal injection protocol, and in that meeting, Carruthers "only wanted to talk about Alfredo Shaw." *Id.* She also testified that the two spoke "on average, once every other month during her representation." *Id.* When the two did not speak by phone, Carruthers "regularly left voicemails for her with some variation on the theme of Mr. Shaw, 'fraud upon the court,' and writing to the [Board of Professional Responsibility (BPR)]." *Id.*

Henry recalled that Carruthers spoke to her about taking certain actions that "would result in his immediate release[]"—all of which revolved around drawing attention to the perceived "fraud upon the court." *Id.* Henry testified that she "declined Mr. Carruthers' request to file a disciplinary complaint against former assistant district attorney John Campbell for his actions in the fraud regarding Mr. Shaw." *Id.*

*Third,* Satyra Deaver, chief paralegal for the same office, testified that she has worked on Carruthers's case since 2008. *Id.* Deaver testified as to some of the behaviors that, in her lay view, exhibited Carruthers' paranoias. *Id.* These included: poisoning concerns, accusations of various homosexual advances/sexually transmitted infections, 24/7 monitoring, and wiretapped phones. *Id.* Deaver also testified as to some of Carruthers' perceived "fixations," namely: "taking the bar cards of every attorney and judge who wronged him" and "promoting hashtags" on social media. *Id.* at *12. She agreed that publicity is a "big part" of her office and that "publicity, including pushing hashtags, can engender results." *Id.* Deaver also discussed Carruthers' beliefs around Alfredo Shaw, and she agreed that Carruthers "did not like how the trial went" and that he has been "fighting since the trial to overturn his conviction." *Id.*

*Fourth,* Casey Swanson, an attorney from an unrelated federal public defender office, testified that she never represented Carruthers but "became acquainted" with him after he left

15

"several voicemails" on her work phone. *Id.* Swanson "eventually obtained" permission from Tennent to speak with Carruthers directly in 2022 and then began forwarding Carruthers's voicemails to Deaver. *Id.* Even though she initially believed these calls to be "spam" calls, Swanson never blocked his number. *Id.* Once they began to speak directly, Swanson generally spoke with Carruthers twice a year, but after his execution was set, she began taking his calls "once or twice per month." *Id.* Carruthers also spoke to her about Shaw and the associated tax evasion, wiretaps, $3.3 million, and hashtags. *Id.*

*Fifth,* Dr. Agharkar, a psychiatrist, testified on Carruthers' behalf in support of his petition to be declared incompetent to be executed. *Id.* Dr. Agharkar testified at he was initially approached in 2008 for the purpose of (1) "improving communication with Mr. Carruthers" and (2) "ultimately seeking an evaluation of Mr. Carruthers' competency to stand trial (post-trial) and his competency to waive certain rights." *Id.* In 2011, Dr. Agharkar conducted an in-person interview and thereafter diagnosed Carruthers with schizoaffective disorder, bipolar type. *Id.* at *12-*13. Despite multiple attempts beginning in 2026, Carruthers refused to meet with him. *Id.* at *12. Although unable to conduct a follow-up in-person interview or evaluation after fifteen years, Dr. Agharkar said that his diagnosis of Carruthers remained the same. *Id.* at *13.

Dr. Agharkar qualified that he was "addressing only the rational component of the *Panetti* standard and was not testifying that Mr. Carruthers lacks awareness of his conviction and death sentence." *Id.* In so doing, Dr. Agharkar discussed many of the same "delusions" previous witnesses discussed. *Id.* Dr. Agharkar conceded that, in his observations of Carruthers during the hearing, Carruthers "did not appear to be in a manic state at this time; did not appear to be psychotic; and showed no signs of psychosis." *Id.*

16

At the close of his testimony, Dr. Agharkar engaged in a lengthy exchange with the trial court, which the trial court determined undermined the overall credibility of his opinion testimony.[5] *Id.* at \*14-\*16. When questioned about his testimony regarding Carruthers' rational understanding, Dr. Agharkar opined that, "I think it's two things. One is that the execution will not go forward because the whole point of it is to get him to settle for money, but that if he were to be executed, it would be to stop him from getting the money." *Id.* at \*14. The trial court then pointed out, "despite the importance of this testimony," Carruthers's supposed belief that he is going to be executed to keep Carruthers from collecting money was not mentioned in Dr. Agharkar's report. *Id.* After having an opportunity to review his reports, Dr. Agharkar said "he could not find it in any declaration or in either report." *Id.* He apologized "if he misspoke or 'took that too far.'" *Id.*

The trial court also questioned Dr. Agharkar on his opinion that Carruthers's delusions "'interlock[] or overlap[] with the others combining synergistically to prevent a rational understanding of the State's rationale for his execution.'" *Id.* at \*16. Seeking clarification, the trial court inquired if "each of the three things" cited by Dr. Agharkar as to why Carruthers meets the *Panetti* standard "are not good enough alone, but somehow the combined effects of them are greater than their sum." *Id.* Dr. Agharkar confirmed, "'It means greater than their sum, yes.'" *Id.*

For the State's case, the State presented Dr. Schact, a clinical and forensic psychologist. *Id.* Dr. Schact attempted to meet with Carruthers, who declined by making a "zipping gesture across his lips[]." *Id.* Dr. Schact was able to observe Carruthers, whom he described as "'well-groomed and appear[ing] clean.'" *Id.* Dr. Schact viewed the interior of Carruthers's cell, which

---

[5] In its order, the trial court found that "Dr. Agharkar's conclusion 'was not well reasoned, was speculative, and was based on inferences not fully supported by the record.'" *Id.* at \*19.

17

he described as "'very well-organized and clean.'"  *Id.*   During his case review, Dr. Schact reviewed various pro se filings, which he characterized as "'organized, reasonably well-written,'" seemingly void of "delusional material," and not appearing to be "the product of a mind that is cognitively impaired." *Id.*

Dr. Schact did not opine on the ultimate legal issues on competency, nor did he offer a diagnosis of Carruthers, whom he did not examine. *Id.*  He agreed that multiple evaluations characterized Carruthers' behavior as characteristic of antisocial personality disorder.  He acknowledged familiarity with Carruthers' prior mental health evaluations and resulting opinions that he displayed antisocial personality traits, "some paranoia," and narcissistic behavior. *Id.*  He also agreed that the tone of his own report weighed "more heavily" toward Carruthers having a personality disorder, as opposed to a psychotic disorder. *Id.*

In discussing *Panetti*'s "rational understanding" language, Dr. Schact said "it is perilous to rely solely on your own point of view as an observer without access to the understanding and point of view of the person articulating whatever is being said." *Id.*  Dr. Schact was questioned about an excerpt from his report, which read, "To be considered for classification as a delusion, a false belief must be held and maintained with subjective sincerity.... False beliefs propagated insincerely can be observed in the context of goal-directed manipulations, con schemes, gaslighting, vindictive harassment, and malignant scripts and interpersonal agenda characteristic of severe personality disorders[]." *Id*.  Dr. Schact explained that "in the absence of an interview," assessing Carruthers' sincerity is "extremely difficult because you have no basis to assess the sincerity." *Id.*

In Carruthers's rebuttal case, counsel called Carruthers as a witness. *Id.* at *17.  Following a discussion for which Carruthers was not present, the trial court brought Carruthers back into the courtroom and informed him that counsel "wanted to question him as a witness." *Id.*  The trial

18

court explained that counsel "called him to help his case rather than to be a witness against himself[.]" *Id.* Carruthers asked for independent counsel but was declined. *Id.*

Carruthers testified that he "never stated" that his case "was a sham." *Id.* When asked again, he repeated that he "[n]ever thought that ever." *Id.* Carruthers also denied telling Tennent that the State was trying to coerce him into taking an *Alford* plea, saying those were Tennant's words, not his. *Id.* at *18. He stated that he has attempted to be exonerated. *Id.* When asked by his current counsel why the State is going to execute him, Carruthers "described how false evidence provided by Mr. Shaw was used against him to obtain his conviction." *Id.* at *17. Later, Carruthers referred his current counsel to his "fraud upon the court" packet, which apparently details the "Alfredo Shaw fraud." *Id.* at *18.

When asked by current counsel about the connection between the $3.3 million and the information about Shaw and CrimeStoppers, Carruthers provided a coherent explanation that, "'just like car insurance'" attorneys who aided Shaw and participated in the fraud are liable under their legal malpractice insurance because attorneys are ethically prohibited from participating in fraud. *Id.* Carruthers explained that "the ethical investigations and disbarment" could begin with his current counsel and continue "like dominos, until each attorney involved in the fraud is disbarred." *Id.* When current counsel asked, "'If all of the attorneys fall the way you want them to, will you be executed?'" Carruthers responded, "'I hope not.'" *Id.*

On cross-examination, Carruthers agreed that he has attempted to raise the "fraud" issue for over thirty years, to anyone who would listen. He testified as to his belief that, if he is executed, it will be because he was wrongfully convicted based upon this false information. *Id.*

Following the four-day hearing, the trial court entered a twenty-two-page order finding Carruthers competent to be executed, through a straightforward application of *Panetti*. (ECF No.

228-15, PageID 30958-79.)  The court found that Carruthers "has an awareness of and a rational understanding of his conviction and his impending execution," as well as a "rational understanding of the relationship between the conviction and the impending execution."  (*Id.* at PageID 30979.) Tracking *Madison*, the court reasoned that it need not determine Carruthers's precise diagnosis, if any, but must instead "decide whether the *effect* of any diagnosis and/or mental illness prevents Mr. Carruthers from understanding why, and the reasons that, the State intends to execute him." The court found that "no such diagnosis and/or mental illness prevents Mr. Carruthers from understanding why, and the reasons that, the State intends to execute him."  (*Id.* at PageID 30974.)

In support of these conclusions, the trial court found that Dr. Agharkar's opinion about Carruthers's incompetence "was not well reasoned, was speculative, and was based on inferences not fully supported by the proof."  (*Id.* at PageID 30974-75.)  Carruthers, the court found, has acknowledged his pending execution date on his tablet and on the telephone.  (*Id.* at PageID 30975.)  And since his execution's setting, Carruthers "has filed pro se motions seeking relief from his convictions and has attempted to promote a social media campaign via hashtags to seek assistance with his [innocence] claims."  (*Id.*)  The trial court found that Carruthers knows he is being executed for the murder convictions, but he simply claims that he was wrongfully convicted. (*Id.*)  The trial court also relied on its observations of Carruthers's demeanor in court, noting that he appeared to be alert and interested in the hearing, did not appear to be in a manic state, conducted himself appropriately all four days of the hearing, addressed the court respectfully, was clear and articulate, and communicated with counsel.  (*Id.* at PageID 30976.)

### 3.    Tennessee Supreme Court's Affirmance

In affirming the trial court's competency finding, the Tennessee Supreme Court held that the proof established that Carruthers "has a rational understanding that he was convicted on three

counts of first degree murder and that the jury sentenced him to death on each conviction."

*Carruthers,* 2026 WL 1257769, at *21. The court further held that Carruthers has a "rational

understanding that his execution is scheduled for May 21, 2026," and a "rational understanding of

the reason the State is going to execute him." *Id.*

The court first noted the dearth of evidence on Carruthers's *present* competency. *Id*. at

*20. "Dr. Agharkar relied on his original [2011] diagnosis, on the declarations and testimony of

prior counsel (and a paralegal), and on various records and audio recordings provided to him by

counsel." *Id.* But prior counsel last communicated with Carruthers in 2023 and 2025, well before

the competency hearing. *Id.* And given that lack of recent contact, the court found that former

counsel "arguably could not offer informed testimony on the ultimate question of whether Mr.

Carruthers meets the *Panetti* standard." *Id.*

The court also noted Dr. Agharkar's admission that he lacked evidence to support his

conclusion that Carruthers believes he will be executed to prevent him from getting money. *Id.* at

*21. And the court concluded that "[t]he weight, if any, given to Dr. Agharkar's report and hearing

testimony was solely within the purview of the trial court." *Id.*

The court further emphasized Carruthers's testimony undermining his own witnesses'

credibility, saying that his witnesses gave "their words," not "his words." *Id*. at *22. Carruthers

also denied believing that his conviction was a "sham," as suggested by prior counsel and repeated

by Dr. Agharkar. *Id.*

The court cited Carruthers's extensive efforts at exoneration to support the conclusion that

"the evidence in the record fully supports and does not preponderate against the trial court's finding

that Mr. Carruthers is presently competent to be executed." *Id.* For example, "[a]fter his execution

date was set, Carruthers filed pro se pleadings seeking relief from his conviction, and he has asked

21

others to promote certain hashtags on social media to bring public awareness to his plight." *Id.*
And he "gave no real indication he believes he is going to be released from prison unless he is exonerated." *Id.*

Finally, in rejecting Carruthers's argument that "the trial court misapplied the competency standard enunciated in *Panetti v. Quarterman*," the Tennessee Supreme Court found that the trial court "cited the appropriate competency standard and repeatedly mentioned the *Panetti* prong at issue—whether Mr. Carruthers has a rational understanding of the connection or the reason the State intends to execute him." *Id.* The trial court simply "made credibility determinations and assigned its desired weight and value to the evidence presented, and then it correctly applied the *Panetti* standard to the evidence." *Id.*

### 4.    Second Federal Habeas Corpus Petition

On May 15, 2026, Carruthers filed a second habeas corpus petition, arguing that he is incompetent to be executed under the Eighth Amendment. (ECF No. 225). He also contemporaneously filed an application for stay of execution. (ECF No. 226). On May 16, 2026, Respondent filed the state-court record as relevant to Carruthers' competency proceedings. (ECF No. 227). On May 18, 2026, Respondent manually filed the audio/visual and electronically submitted exhibits by hand-delivering the same to the clerk's office in the Western District Court for Tennessee at Memphis. Respondent now files an answer to Carruthers' second habeas corpus petition and a response in opposition to his application for a stay of execution.

### ARGUMENT

Carruthers claims that he is incompetent to be executed and, thus, ineligible for execution under the Eighth Amendment. He argues that he is entitled to de novo review of this claim because

the Tennessee Supreme Court unreasonably applied federal law and unreasonably determined facts when rejecting his competency claim.  (ECF No. 225, PageID 20503-14.)

Carruthers's arguments fail, and he is not entitled to de novo review.  AEDPA deference readily applies here.  The state court neither unreasonably applied federal law nor made an unreasonable determination of the facts.  Carruthers paints the Tennessee Supreme Court's citation to one of its prior state court competency decisions, *State v. Irick,* 320 S.W.3d 284 (2010), as an unreasonable reinterpretation of the *Panetti* standard.  (*Id.* at PageID 20504.)  But this kind of flyspecking of state-court opinions is expressly disallowed under AEDPA, and an assessment of the Tennessee Supreme Court's opinion readily shows that the state court did not unreasonably apply *Ford* and its progeny.  Furthermore, the Tennessee Supreme Court's reasoned determination under the presented proof that Carruthers is aware of and rationally understands the relationship between his conviction and sentence and his execution is not an unreasonable determination of the facts.  Applying AEDPA deference, the Court should reject the claim and deny the petition.

**I.     The State Court Did Not Unreasonably Apply Federal Law Under *Ford* and Its Progeny When It Determined Carruthers Is Competent to Be Executed.**

Carruthers argues that the Tennessee Supreme Court unreasonably applied *Panetti* and *Ford* in affirming the lower court's decision that Carruthers is competent to be executed.  Regarding *Panetti,* Carruthers argues that the court "conflated Mr. Carruthers's awareness" about his impending execution and the State's reason for his execution "with a rational understanding." (*Id.* at PageID 20504.)  To reach his destination, Carruthers selectively quotes from the Tennessee Supreme Court's opinion in *Irick*, arguing that the Tennessee Supreme Court "reinterpreted" the *Panetti* standard and "reduce[d] *competency* to mere awareness[.]"  (*Id.* at PageID 20504-05.)  As it relates to *Ford,* Carruthers argues that the state court decision was unreasonable because *Ford* "holds that a prisoner's belief that the State will not execute is a legitimate basis for finding him

incompetent." (*Id.* at PageID 20510.)  For the reasons stated below, the state court decision reflects a reasonable application of federal law, and Carruthers is not entitled to relief at this juncture.

**A.**  Starting with *Panetti*, the Tennessee Supreme Court first recognized in *Irick* that the then-recent decision in *Panetti* announced the new governing standard for competency to be executed under the Eight Amendment.  After recounting what *Panetti* requires a prisoner to prove to establish incompetency to be executed, the court explained the *Panetti* standard as follows:

> In our view, *Panetti* teaches that the test for competence to be executed requires a prisoner to have "a rational understanding of his conviction, his impending execution, and the relationship between the two." *Billiot v. Epps*, 671 F. Supp. 2d 840, 853 (S.D. Miss. 2009).  *See also Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498, at *31 (W.D. Tex. Mar. 26, 2008) (opinion after remand from the United States Supreme Court).  Stated differently, under *Panetti*, execution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by the State for the crime committed.  *See Overstreet v. State*, 877 N.E.2d 144, 174 (Ind. 2007).  The Court's decision in *Panetti* also emphasizes that a prisoner seeking to establish incompetency may not be foreclosed from offering proof to show that a mental illness obstructs his rational understanding of his conviction, his impending execution, and the relationship between the two.

*Irick*, 320 S.W.3d at 295.  In two recent competency decisions, including Carruthers's, the Tennessee Supreme Court included the following abbreviated version of the same quotation:

> In our view, *Panetti* teaches that the test for competence to be executed requires a prisoner to have "a rational understanding of his conviction, his impending execution, and the relationship between the two."  Stated differently, under *Panetti*, execution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by the State for the crime committed.

*Black*, 2025 WL 1927568, at *5; *Carruthers*, 2026 WL 1257769, at *8.

In a weak attempt to avoid AEDPA deference, Carruthers makes the curious argument that the second sentence in the above-quoted paragraph from *Irick* treats *Panetti* as requiring a rational understanding of the conviction and of execution but *not* a rational understanding of the relationship between the two.  Yet the immediately preceding and succeeding sentences within the

very same paragraph both leave no doubt about the state court's awareness that *Panetti* requires a "rational understanding of his conviction, his impending execution, *and* the relationship between the two." *Irick*, 320 S.W.3d at 290 (emphasis added).  And the remainder of all three state-court opinions readily confirm that the Tennessee Supreme Court indeed requires a prisoner to prove a rational understanding of "the relationship between the two."  *See Id.* at 295; *Black,* 2025 WL 1927568, at *5; *Carruthers,* 2026 WL 1257769, at *8.  Despite Carruthers's argument to the contrary, this does not evidence an unreasonable application of *Panetti* sufficient to overcome AEDPA deference.[6]

The Sixth Circuit has squarely rejected this very kind of flyspecking in federal-court review of a state-court opinion.  *Rogers*, 69 F.4th at 391-92.  It offers no insight into whether a state-court adjudication actually represents "an extreme malfunction of the state criminal justice system." *Id*. And a review of the Tennessee Supreme Court's full analysis here readily shows no unreasonable application of governing federal law (*i.e.*, *Panetti*, as refined by *Madison*).  On the contrary, the court correctly stated that, taking *Ford, Panetti,* and *Madison* together, "the critical question is whether the inmate 'can reach a rational understanding of why the State wants to execute him[,]'" *Carruthers,* 2026 WL 1257769 at *8.  And it reasonably applied that standard.  *Infra section I(C).*

---

[6] In a letter providing supplemental authority, (ECF NO. 233), Carruthers directs this Court's attention to *Thompson v. Bell,* 580 F.3d 423 (6th Cir. 2009) in which the Sixth Circuit held that the Tennessee Supreme Court's decision was an unreasonable application of *Ford* and *Panetti*. However, *Thompson* dealt with the initial issue as to whether he made the requisite threshold showing for an evidentiary hearing.  *Thompson,* 580 U.S. at 436-37.  As is clear, Carruthers was granted an evidentiary hearing.  Moreover, in *Irick,* when the Tennessee Supreme Court revisited the standard for competency following the Supreme Court's decision in *Panetti,* the *Irick* court explicitly overruled its own prior decision in *Thompson v. State,* 134 S.W.3d 168 (Tenn. 2004), to the extent that that decision "can be read as inconsistent with *Panetti*[.]" *Irick,* 320 S.W.3d at 295 n.9.

**B.**  Regarding *Ford*, Carruthers argues that Justice Powell's concurrence in *Ford* disallows execution if the prisoner irrationally believes that he will not be executed on account of delusional beliefs.  In his telling, the Tennessee Supreme Court unreasonably applied *Ford* by referencing the trial court's determination that Carruthers is not such a prisoner.  *Carruthers*, 2026 WL 1257769, at \*20 n.8; *see also Panetti,* 551 U.S. at 949 (holding that Justice Powell's concurring opinion in *Ford* constitutes 'clearly established' law for purposes of § 2254).  But the state courts found that Carruthers does *not* have irrational beliefs that keep him from rationally understanding the relationship between his conviction and sentence and his execution.  The Tennessee Supreme Court thus could not have unreasonably applied *Ford* in ignoring Carruthers's supposed irrational beliefs; the state court concluded that Carruthers has no irrational beliefs that inhibit him from having the requite understanding for competency.  *Id.* at \*22.

If anything, this argument is a restatement of Carruthers's challenge to the state court's underlying fact-finding, which is addressed more fully below.  Carruthers has shown no unreasonable application of *Ford*.

**C.**  Carruthers cannot otherwise establish an unreasonable application of federal law because a fairminded jurist presented with the same factual record could resolve Carruthers's competency claim just as the Tennessee Supreme Court did here.  That court correctly identified and applied the governing standard for claim of incompetency to be executed.  *Carruthers,* 2026 WL 1257769, at \*8-\*9.  The court explained that, following *Madison*:

> [t]he critical question is whether a "prisoner's mental state is so distorted by a mental illness" that he lacks a "rational understanding" of 'the State's rationale for [his] execution. Or similarly put, the issue is whether a "prisoner's concept of reality" is "so impair[ed]" that he cannot grasp the execution's meaning and purpose' or the "link between [his] crime and its punishment."

*Id.* (citing *Madison,* 586 U.S. at 269 (quoting *Panetti,* 551 U.S. at 958-60.)).    Thus, the "critical question is whether the inmate 'can reach a rational understanding of why the State wants to execute him.'" *Id.* at \*9 (citing *Madison,* 586 U.S. at 283) (internal quotations omitted).

There can be no genuine dispute that the Tennessee Supreme Court correctly identified the "clearly established Federal law," as announced by the Supreme Court, relating to competency to be executed.    And the court's application of this "clearly established Federal law" was not unreasonable, as the court's ruling did not "unreasonably app[ly] that principle to the facts of the [petitioner's] case." *Pinholster,* 563 U.S. at 182.    As the Tennessee Supreme Court explained, the proof presented at the competency hearing showed Carruthers has the requisite rational understanding.    As the state court explained:

> In this case, the proof established that, although he professes his innocence, Mr. Carruthers has a rational understanding that he was convicted on three counts of first degree murder and that the jury sentenced him to death on each conviction. Mr. Carruthers also has a rational understanding that his execution is scheduled for May 21, 2026.    Following our review, we agree that Mr. Carruthers also has a rational understanding of the reason the State is going to execute him.

> Mr. Carruthers declined to be interviewed by either court-appointed expert.    Dr. Agharkar opined in his report and during his direct testimony that Mr. Carruthers is not competent to be executed under *Panetti* because certain persistent delusions and paranoia regarding his attorneys prevent him from having a rational understanding of the connection between his conviction and his impending execution.    However, upon focused questioning by the trial court, Dr. Agharkar admitted he lacked evidence to support his conclusion that Mr. Carruthers believes he is going to be executed to prevent him from getting his money—a basis Dr. Agharkar failed to include in his March 2026 report.    As to other conclusions cited in his report, Dr Agharkar said he relied on the declaration of Richard Tennent that, as explained, summarized Mr. Tennent's beliefs about Mr. Carruthers' beliefs. During the trial court's questioning, Dr. Agharkar admitted he did not know when the beliefs were expressed, but he was aware that Mr. Tennent's representation ended in 2023.    The weight, if any, given to Dr. Agharkar's report and hearing testimony was solely within the purview of the trial court.

> On the other hand, Mr. Carruthers testified that the *Van Tran* hearing witnesses gave "their words," not "his words."    Mr. Carruthers does not believe his conviction was a "sham" as suggested by prior counsel and repeated by Dr. Agharkar.    He

27

continues to believe his conviction was secured by the false testimony of Alfredo Shaw. *Mr. Carruthers understands the State plans to execute him for his convictions.* After his execution date was set, Mr. Carruthers filed pro se pleadings seeking relief from his conviction, and he has asked others to promote certain hashtags on social media to bring public awareness to his plight. Mr. Carruthers gave no real indication he believes he is going to be released from prison unless he is exonerated. *The proof established that Mr. Carruthers has a rational understanding of the reason the State plans to execute him.* We conclude that the evidence in the record fully supports and does not preponderate against the trial court's finding that Mr. Carruthers is presently competent to be executed.

*Carruthers,* 2026 WL 1257769, at *20-*22 (emphasis added). The Tennessee Supreme Court also

expressly rejected Carruthers's assertion that the trial court misapplied *Panetti*:

The trial court cited the appropriate competency standard and repeatedly mentioned the *Panetti* prong at issue—whether Mr. Carruthers has a rational understanding of the connection or the reason the State intends to execute him. Further, the record indicates the trial court questioned witnesses, particularly Dr. Agharkar, about this prong, asking him specific questions about the delusions cited by Dr. Agharkar and how certain delusions impact this prong. Contrary to Mr. Carruthers' assertion, the trial court did not treat Mr. Carruthers' "delusional belief system as irrelevant," and it did not misapply the *Panetti* standard. Instead, in its finding that Mr. Carruthers is competent to be executed, the trial court made credibility determinations and assigned its desired weight and value to the evidence presented, and then it correctly applied the standard to the evidence.

*Id.* at *22.

As the court aptly noted, Carruthers presented "limited direct evidence as to his present beliefs." *Carruthers,* 2026 WL 1257769, at *20. Again, many of the witnesses called on behalf of Carruthers could not testify to his present competency as they had not spoken directly with Carruthers recently. For example, Richard Tennant and Houston Goddard, two of Carruthers' prior counsel whose representation ended in 2023, testified that they had not spoken with Carruthers since that time. *Id.* at *10; *17. Kelley Henry, also prior counsel of Carruthers, testified that her representation of Carruthers ended in 2025, and she had not spoken to him since that time. *Id.* at *11. What is more, Dr. Agharkar—whose diagnosis Carruthers vehemently protests—had

28

not spoken to him in fifteen years, and Carruthers rejected Dr. Agharkar's efforts to evaluate him in 2026.

The record fully supports the court's observation that "the most recent direct evidence of Mr. Carruthers' present beliefs about his impending execution" came from Carruthers alone, further demonstrating that a fairminded jurists could reach the same conclusion as the court did here. And his present counsel acknowledged this at the hearing when stating: "I think the best evidence of what Mr. Carruthers thinks at this moment is Mr. Carruthers." (ECF No. 228-21, PageID 31917.)

Without any warning or preparation, Carruthers was called to testify at his competency hearing by his own counsel. (*Id.* at PageID 31916.) Incensed that his counsel was "forcing [him] to be a witness against [himself]," Carruthers incisively asked the trial court to provide him independent counsel. (*Id.* at PageID 31922.) After some discussion, Carruthers was questioned by counsel as to some of the "delusions" now at issue in this petition. (ECF No. 225, PageID 20516-18.)

And Carruthers offered an explanation on each of the so-called "delusions" now offered to this Court as evidence of incompetence. As for the purported delusion on "his belief" that he is entitled to $3.3 million dollars for "each purported wiretap violation" and "other purported wrongdoing by various defense attorneys, prosecutors, and judges," (*Id.* at PageID 20516-17), Carruthers testified,

> Under ABA Standard 3.3, the lawyer that participated in that fraud upon the grand jury and fraud upon the petit jury and lied for 30 years alleging that Alfredo Shaw was not informant, they are absolutely prohibited from lying under ABA Standard 3.3, Tennessee Supreme Court Rule 3.3. Every time you open your mouth and tell a lie, you are liable under your legal malpractice policy for 3.3 million. That's where the 3.3 come from. Everybody that lied starting from 1994, they are to submit a notice of a claim just like car insurance.

(ECF No. 228-21, PageID 31927.)  As it relates to where the number 3.3 came from, Carruthers testified that, "Just having a notice of a claim is not a claim. You have to put a monetary value on it. And the number is the same one that gets them disbarred, 3.3." (*Id.*)

Specifically discussing the wiretap, Carruthers was asked by counsel, "When you call our office and ask to speak to the wiretap, what do you think that does for you?"  In response, Carruthers testified, "This is how this works.  If I call your office and ask for Ben Leonard, the board say Ben Leonard is out in the field.  Instead of saying the word 'voicemail,' just give me the wiretap." (*Id.* at PageID 31953.)  Carruthers could not have been clearer that asking for the wiretap is his personal vernacular for asking for someone's voicemail—"I just use the word 'wiretap' because they understand me." (*Id.*)  When asked about sometimes "address[ing] the DOJ" by saying "to the DOJ if you're listening," Carruthers repeatedly emphasized "if you're listening"—insinuating that he doesn't believe that the DOJ is actually listening in but, if they ever were, he is providing information. (*Id.* at PageID 31953-54.)

As it relates to Carruthers' proffered "delusion that the State is only pretending to seek to execute him so to force him to accept an *Alford* plea and thereby forfeit the payment of several sums of $3.3 million to which he is entitled[,]" (ECF No. 225, PageID 20517), Carruthers testified that he heard Richard Tennant testify that he believed the State "is playing chicken" with him and "trying to get [him] to take an Alford plea." (ECF No. 228-21, PageID 31938.)  To this, Carruthers testified that he "really wanted to answer that question." (*Id.* at PageID 31939.)  Very clearly, Carruthers stated, "I never had those words. Those are his word." (*Id.*)  Further expanding on this, Carruthers testified,

> I already told you I been restrained for 32 years, drove around like a slave with guns
> on me for 32 years.  It's not a sham.  I've never said that.  Never said chicken, never
> said sham.  Those are his words.  As an officer of the court, he's lying.

(*Id.*)  Regarding whether the State is trying to "coerce [him] into an *Alford* plea," Carruthers said, "I've never had those words.  I've been trying to get exonerated, you understand."  (*Id.* at PageID 31939-40.)  Carruthers testified that his attorneys "pretend" to represent him but, because of the "intrinsic fraud" "really connive to get you executed."  (*Id.* at PageID 31932.)

As it relates to Carruthers' proffered "delusion" that he "believes his release from prison is imminent[,]" (ECF No. 225, PageID 20517-18), Carruthers was asked about a statement made to counsel about "going home" when the "fraud upon the court packet" was presented, during Ms. Deaver's testimony.  (ECF No. 228-21, PageID 31947.)  Disgruntled, Carruthers testified, "no, I did not say that."  (*Id.* at PageID 31948.)  More specifically, Carruthers testified,

> Ask—ask West High did I go home last night.  Ask them where they took me last night, where they brought me back from last night.  Ask that question.  Where did he sleep at last night?  In prison. Ma'am, quit playing games.  Y'all playing games.

(*Id.* at PageID 31949.)

Contrary to Carruthers' argument, "an analysis of the 'link between a crime and its punishment'" is not "glaringly absent" from the court's opinion.  (ECF No. 225, PageID 20506.) The Tennessee Supreme Court aptly observed that Carruthers "continues to believe his conviction was secured by the false testimony of Alfredo Shaw." *Carruthers,* 2026 WL 1257769, at *22.  In summarizing Carruthers' testimony, the court stated, "Ms. Harwell next asked Mr. Carruthers why the State is going to execute him.  Mr. Carruthers described how false evidence provided by Mr. Shaw was used against him to obtain his conviction." *Id.* at *19.  Counsel asked Carruthers, "Dr. Agharkar said you were delusional, that you have schizoaffective disorder and that you don't understand why you're going to be executed.  Tell us why the State is going to execute you." (ECF No. 228-21, PageID 31949.)  Carruthers' response left no mystery that the "link" between the crime and its punishment—to Carruthers—begins and ends with the alleged fraud upon the court and false testimony of Alfredo Shaw.  (*Id.*)  He said: "[F]raud upon the court.  The fraud that

31

happened with John Campbell, … Took confidential informant Jake, AKA Alfredo Shaw, and that's the reason why the State will execute me[.] … That's why, for fraud." (*Id.*)

This record evidence clearly supports the state court's conclusion that Carruthers has the requisite rational understanding and is not incompetent to be executed. During the following, short exchange with the State's counsel on cross-examination, Carruthers confirmed his testimony succinctly:

> Q:     . . . For 32 years you have been trying to raise the issue of what you believe was false testimony offered against you; is that fair?
>
> A:     Perjured, solicited, manufactured testimony paid with taxpayer dollars.
>
> Q:     And you have been trying to raise that issue with anyone who would listen: Your lawyers, Courts, anyone who might listen, the Department of Justice, the federal government, the state prosecutors, the JRU –
>
> A:     -- TDOC Internal Affairs.
>
> Q:     And the media; right?
>
> A:     Anybody that'll listen.
>
> Q:     Anybody that would listen to those claims. And you believe sitting here today that if you are executed, it will be because you were wrongfully convicted based upon this false information; is that fair?
>
> A:     Yes.

(*Id.* at PageID 31956-57.)

Stated simply, a fairminded jurist could conclude under this record that Carruthers failed to show that he lacks a rational understanding of the conviction and sentence, the execution, and the relationship between the two. Thus, Carruthers can show no unreasonable application of federal law. While he (or his counsel) may disagree with the reasoned decision reached in state court, that is woefully insufficient to establish a rare unreasonable application of federal law.

32

II.   **The State Court Decision Does Not Involve an Unreasonable Determination of the Facts in Light of the Evidence Presented in State Court.**

Next, Carruthers argues that the state court's deference to the trial court's finding that "Mr. Carruthers (as confirmed by prior counsel, the chief paralegal, and himself) has an awareness of and a rational understanding of his conviction and his impending execution" was an unreasonable determination of the facts under § 2254(d)(2).  (ECF No. 225, PageID 20511.)  In support of this claim, Carruthers argues that the state court's "conclusion that the testimony of Mr. Carruthers's prior counsel and Ms. Deaver somehow supports the notion that Mr. Carruthers rationally understands the reasons for his execution is vacuous." (*Id.* at PageID 20512.)  Carruthers contends that the Tennessee Supreme Court's "legal error in the *Irick* standard" contributed to this "flawed factual finding" because—according to Carruthers—"the *Irick* standard effective equates awareness with rational understanding." (*Id.* at PageID 20513.)  In Carruthers's telling, the trial court was required to ignore Carruthers's own live testimony and instead conclude, based upon stale evidence provided by his retained expert and from staff members of his counsel's office, that Carruthers is incompetent.  At base, a state court's determination of how to weigh the evidence is an ordinary, run-of-the-mill credibility determination that this Court may not now second-guess as an "unreasonable determination."  The record does not "compel the conclusion" that state court was required to make contrary factual findings and to declare Carruthers incompetent for execution.  *Rice*, 546 U.S. at 341-42.

As a preliminary matter, Carruthers' argument grounded in *Irick* rests upon a faulty premise.  As explained above, *Irick* contains no legal error, and the Tennessee Supreme Court decision at issue here did not replicate any error or unreasonably apply "clearly established Federal law."  Carruthers's selective quotation of the Tennessee Supreme Court's decision does not evidence a "misunderstanding of the legal standard" that "contribute[d] to factual findings that

ascribe incorrect meaning and significance to facts in evidence." (*Id.* at PageID 20514.) Just as

he can show no unreasonable application of federal law based upon his granular parsing of a block-

quote, so too does he fail to establish that the misunderstanding of the governing legal standard

infected the state court's factual determinations.

More to the point, the state court record does not "compel the conclusion" that the state

courts must have found, as a matter of fact, that Carruthers is incompetent. *Carter,* 900 F.3d at

768 (quoting *Rice,* 546 U.S. at 341-42). Without question, the record supports the Tennessee

Supreme Court's deference to the trial court's factual finding that Carruthers is competent—that

he has a rational understanding not only of his execution and sentence but also of the relationship

between the two. Stated differently, any mental illness or personality disorder that Carruthers

purports to have—a factual issue expressly left unresolved in state court—does not distort his

mental state such that his "concept of reality" is "so impair[ed]" that he cannot grasp the "link

between [his] crime and its punishment." *Panetti,* 551 U.S. at 958, 960.

The record fully supports the Tennessee Supreme Court's analysis and undermines

Carruthers's weak invocation of an unreasonable determination of the facts. While Carruthers

makes much of the voluminous nature of a record that he chose to create here, (*See e.g.* ECF No.

225, PageID 20520-21), that voluminous nature does not distract from the obvious fact that much

of what he relies upon is stale evidence that is irrelevant to his *present* competency for execution.

None of that evidence shows an unreasonable determination of the facts under § 2254(d)(2) such

that every reasonable jurist would be compelled to reach a different conclusion.

As already shown, Carruthers's argument as to his lack of a rational understanding rests

largely upon stale testimony from prior counsel and counsel's chief paralegal. (ECF No. 225,

PageID 20512-13.) But Carruthers omits his own testimony at the evidentiary hearing. When

34

presented with his prior counsel's testimony describing his beliefs, he called it "their words" not "his words." *Carruthers,* 2026 WL 1257769, at \*22.

And Carruthers's own testimony supports the state court's factual determination that he has a rational understanding of the relationship between his conviction and sentence and his execution. In particular, Carruthers fervently believes that he was erroneously convicted for the murders of Marcellos Anderson, Delois Anderson, and Freddrick Tucker and sentenced to death because of what he short handedly refers to as "fraud upon the court." His hearing testimony makes clear that the "fraud" to which Carruthers referred is the "fraud on the court" argument that Carruthers recently presented to the Sixth Circuit in his (unsuccessful) motion to recall that court's mandate. (ECF 220.) Specifically, Carruthers believes that that certain state actors committed a "fraud on the court" by concealing that Alfredo Shaw, a defense witness who provided testimony adverse to Carruthers, was a paid government informant. While there was no "fraud on the court," Carruthers's contrary belief is not "delusional." At minimum, the state-court record does not "compel the conclusion" that it is or that any "delusion" inhibited his ability to rationally understand the relationship between his conviction and sentence and his execution.

Multiple times throughout his testimony, Carruthers's counsel asked why the State plans to execute him, and he responded consistently. *First,* Carruthers testified that he believed the State was going to execute him based upon:

> the false testimony of a Organized Crime informant named Alfredo Bernard Shaw who was never around me. And the Organized Crime Unit, the Memphis Police Department, the Memphis Police Department Homicide and probably seven to ten of the top assistant prosecutors met over the weekend for 48 hours with this informant and coerced him into manufacturing probable cause which they didn't have. And this informant named Alfredo Bernard Shaw CI number 1069 for Organized Crime Unit and badge number for the Sheriff's Department is 2282. They convened a special grand jury and had him to lie for them because they didn't have probable cause. And after he did that, they had him to call CrimeStoppers – well let me back up.

35

...

> And after that they noted on the CrimeStoppers form without this information from CI Jake[7] confidential informant Mr. Carruthers gets released. So to keep me from getting released, they committed a crime, a federal crime. It's not a sham.

(ECF No. 228-21, PageID 31925-26.)

*Next,* when his counsel presented him with Dr. Agharkar's testimony that he does not understand the reason for his execution and then asked him to explain "why the State is going to execute [him]," (*Id.* at PageID 31949), Carruthers again had no issue providing his stated belief:

> I think the State said it well for me fraud upon the court. The fraud that happened with John Campbell, John Campbell the now sitting judge who represented the State on post conviction, took the fraud to the grand jury. Took the confidential informant Jake, AKA Alfredo Shaw, and that's the reason why the State will execute me for violating my constitutional right by committing fraud and by your office concealing the CrimeStoppers report from me until 2023. That's why, for fraud. Conspiracy under the color of law. That's why.

(*Id.* at PageID 31949.) In a follow-up question on whether "the State [is] executing [him] to keep the fraud from coming out[,]" Carruthers responded, "Ma'am, you got to ask that to the State. You asking the wrong person. There go three State people right there." (*Id.*) When pressed further on this point as to what he thought the reason for his execution is, Carruthers—for a *third* time—did not waiver or stray from the two prior answers:

> Fraud upon the court, the conspiracy that was committed with Alfredo Shaw and John Wheeler Campbell convening a special grand jury with all his other colleagues, . . . concealed the Organized Crime file so I couldn't impeach his lies, wouldn't produce the evidence of other people he framed and recanted. When I asked [Mr. Shaw] in the trial on page 2254 of the transcript: Mr. Shaw, have you ever been Shelby County informant? Relevance. You know what the relevance. Goes to his credibility. That's why the State will do it for that fraud.[8]

(*Id.* at PageID 31949-50.)

---

[7] "CI Jake" is Alfredo Shaw. (*Id.* at PageID 31949.)

[8] The exchange Carruthers referenced here can be found on pp. 2254 in Volume 75 of the trial transcripts of evidence. (ECF No. 54-4, PageID 938.)

In a separate exchange, Carruthers testified that he believes "[w]ithout Mr. Shaw's testimony [he] [has] a[n] actual innocence claim." (*Id.* at PageID 31941.) Carruthers further testified that the State's theory against him at trial "is Alfredo Shaw.... I'm standing trial for the lie that Mr. Shaw made." (*Id.* at PageID 31941-42.) Doubling down on his assertion of innocence, Carruthers requested his counsel to "pull [the CrimeStoppers form] up. Let's not either one of us be verbatim about it. Let the judge see that I'm actually innocent and without the Alfredo Shaw lie I would be released. I'm actually innocent." (*Id.* at PageID 31943.)

In counsel's and Carruthers's *fourth* exchange on his understanding of the reason for his execution, counsel asked Carruthers if he was told "that the State intends to execute you for triple murder, not for fraud, do you believe that to be true?" (*Id.* at PageID 31964.) In response, Carruthers stated, "That's not true. It's fraud. The fraud happened. The Alfredo Shaw fraud happened. The lie saying he ain't no informant, that fraud happened. You can't take that away. You can't take that part out of the equation." (*Id.*)

This testimony confirms Carruthers's belief that he is actually innocent and was wrongfully convicted and sentenced to death. And if proof of false testimony were exposed, he would be exonerated. This does not "compel the conclusion" that the state court must have found that Carruthers's "concept of reality" is "so impair[ed]" that Carruthers lacks the requisite rational understanding and is incompetent to be executed. The Tennessee Supreme Court's factual determinations were not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ritcher*, 562 U.S. at 103.

37

Beyond his own testimony, other evidence in the state-court record confirms Carruthers's rational understanding of the relationship between his conviction and sentence and his execution. Carruthers has expressed this same understanding—that he was convicted based on false testimony by Alfredo Shaw—to other individuals that he hoped could garner media attention as his execution date grew closer.

For example, Carruthers spoke to a documentarian about his case on February 25, 2026. In a portion of that phone call played during the evidentiary hearing, Carruthers says, "This is how innocent I am."  He goes on to express his understanding of the "link between his crime and his punishment"—that he was charged, those charges were dismissed initially for lack of probable cause, that Alfredo Shaw supposedly lied to the grand jury, that the State did not call Mr. Shaw as a witness at trial, and that Mr. Shaw "framed" him when he called Mr. Shaw as a defense witness.[9] In that same recorded portion, Carruthers expressed the need to "prove [his] innocence in the next 10 days," and he encouraged the documentarian to "push the hashtag" on social media to spread awareness.

In another example, a message sent by Carruthers from his tablet to an individual called "Grand Rising Brother X" was read into the record.  There, Carruthers asked for assistance spreading his story on social media using specific hashtags and sharing his message that he believes he was convicted because Alfredo Shaw was paid to lie.  (ECF No. 228-18, PageID 31367).  Both of these examples undermine Carruthers's assertions that the state court made an unreasonable determination of the facts, such that every fairminded juris would agree with the determination's unreasonableness.

---

[9]  The portion of this phone call referenced here was entered as Exhibit No. 44 – 1772043219_5000_13_136_836_CLIP-B.mp3.  These audio exhibits were manually filed by Respondent on May 18, 2026.

The state court record demonstrates without doubt that, regardless of whether Carruthers suffers from schizoaffective disorder, bipolar type or a personality disorder such as antisocial personality disorder, any such diagnosis does not prevent him from "reach[ing] a rational understanding of the reason for [his] execution." *Panetti*, 551 U.S. at 958. And the state court's factual findings on that point by a preponderance of the evidence are not an unreasonable factual determination in light of the evidence presented at the evidentiary hearing. As stated above, the state court's decision contains no "legal error" and therefore no "flawed fact finding." (ECF No. 225, PageID 20513.) And the record facts do not "compel" a factual determination contrary to that made by the trier of fact who heard the live testimony presented in this case and by the Tennessee Supreme Court when adopting the trial court's factual findings. *Madison,* 586 U.S. at 269. Carruthers can show no unreasonable determination of facts here.

## CONCLUSION

For the aforementioned reasons, the petition for writ of habeas corpus should be denied and dismissed with prejudice.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ Sarah J. Stone*
SARAH J. STONE
Assistant Attorney General
Federal Habeas Corpus Division
P.O. Box 20207
Nashville, Tennessee 37202
P: (615) 253-1967
B.P.R. No. 038824
Sarah.Stone@ag.tn.gov

**CERTIFICATE OF SERVICE**

I certify that the foregoing Answer to Petition for Writ of Habeas Corpus was filed electronically on May 18, 2026.  A copy of this document has been sent by this Court's electronic case filing system to Counsel for Petitioner: Amy D. Harwell, Marshall A. Jensen, and Samantha N. Barry, Federal Public Defender Office, 164 Rosa L. Parks Blvd., Nashville, Tennessee, 37203.

*/s/ Sarah J. Stone*
SARAH J. STONE
Assistant Attorney General