**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| TONY VON CARRUTHERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:08-cv-02425-TLP-cgc |
| | ) | |
| KENNETH NELSEN, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER DENYING APPLICATION FOR STAY OF EXECUTION**

Petitioner Tony Carruthers petitioned the Court for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 225) and applied, through counsel, for a stay of execution on Friday evening, May 15, 2026. (ECF No. 226.) Respondent responded the following Monday (ECF No. 236), and Petitioner replied the next day (ECF No. 237). Petitioner's execution is scheduled for Thursday morning.

The Tennessee Supreme Court ("TSC") has already considered Petitioner's request to stay the execution and denied it. So the narrow issues here are whether the TSC's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law…" or that its decision "was based on an unreasonable determination of the facts in light of the evidence presented…" 28 U.S.C. § 2254(d)(1)–(2). If so, the Court reviews this claim *de novo*. But if not, the Court applies considerable deference to the findings and ruling of the TSC.[1]

For the reasons below, the Court **DENIES** Petitioner's Application.

---

[1] Because the decision of the TSC is central to this ruling, the Court will quote extensively from the TSC's opinion.

## <u>BACKGROUND</u>

The TSC helpfully summarized the criminal trial that led to this Petition, and while long

(about 8 pages), the Court includes it here to provide necessary context.

The proof introduced at the guilt phase of the trial showed that one of the victims, Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair. Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person, and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered Carruthers to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.

In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from Carruthers, who was then in prison on an unrelated conviction. In the letters, Carruthers referred to "a master plan" that was "a winner." Carruthers wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, Carruthers was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, Carruthers remarked to fellow inmate Charles Ray Smith "that would be a good way, you know, to bury somebody, if you're going to kill them. . . . [I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard Carruthers and Montgomery, who also was incarcerated at the Reception Center, talking about Marcellos Anderson after Anderson had driven Carruthers back to the Reception Center from a furlough. According to Smith, when Montgomery asked Carruthers about Anderson, Carruthers told him that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said he and Montgomery could "rob" and "get" Anderson and Johnson once they were released from prison.

When Carruthers was released from the Department of Correction on November 15, 1993, he left the Reception Center with Anderson. Carruthers accompanied Anderson to Andre Johnson's house, and received a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the Department of Correction. Upon his release, Smith warned Anderson and Johnson of Carruthers' and Montgomery's plans to "get them." According to Smith and Johnson, Anderson did not take the warning or the defendants' threats seriously.

In mid-December 1993, Maze, his brother and Carruthers were riding around Memphis together. They came upon Terrell Adair's red Jeep on the street in front of Delois Anderson's home where a drive-by shooting had just occurred. Adair had been injured in the shooting and was in the hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was at the scene of the shooting, and he joined Carruthers in the back seat of Maze's car. According to Maze, Carruthers remarked to Jonathan that, "it would be the best time to kidnap Marcellos," and Jonathan asked, "which one Baby Brother or Marcellos?" Carruthers then nudged Montgomery with his elbow and said "it" was going to take place after James Montgomery was released from prison. About two weeks later, on December 31, Maze saw Carruthers loading three antifreeze containers into a car, and Carruthers indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison. After his release, Montgomery told "Baby Brother" Johnson that he, not Johnson, was in charge of the neighborhood. Montgomery said, "It was my neighborhood before I left, and now I'm back and its [sic] my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf–—g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, Carruthers told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery. About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw, the Montgomery brothers' cousin. Nakeita Shaw, her four children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house

3

with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only Carruthers and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and Carruthers were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, Carruthers, and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, an——r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n——r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan asked Hines to drive him to the cemetery. Hines refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m.,

4

after he was informed of the vehicle fire by law enforcement officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and Carruthers did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and Carruthers to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and Carruthers came to Hines' home looking for Jonathan. Hines advised Carruthers and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and Carruthers drove to a carwash, and James Montgomery paid an unidentified elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither Carruthers nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, Carruthers and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK–47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard. Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on February 25, 1994. Pursuant to a court order, Daniels' casket was disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a

piece of plywood prior to the casket being placed in the grave.

Dr. O.C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. Carruthers, acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, Carruthers had been given a job change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the Reception Center testified that Carruthers was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and Carruthers discussed robbing and getting Marcellos Anderson after Anderson drove Carruthers back to the Reception Center following a furlough. An investigator appointed to assist Carruthers with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to which Carruthers referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, Carruthers had explained that the master plan involved kidnapping Marcellos Anderson. Carruthers' brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that Carruthers and Jonathan Montgomery discussed kidnapping Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James testified that he and Carruthers had

6

been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for Carruthers for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he and Carruthers had been together.

Carruthers also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating Carruthers. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against Carruthers and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when Carruthers called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including Carruthers, and the prosecution, that Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of Carruthers and by threats he had received from him.

Despite this information, Carruthers called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that he had been on a three-way call with Carruthers and either Terry or Jerry Durham, and during this call, Carruthers had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, Carruthers was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. Carruthers and Alfredo Shaw were in the law library when Carruthers told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but Carruthers told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. Carruthers also told Alfredo Shaw that the bodies would

never have been discovered if "the boy wouldn't have went and told them folks." Carruthers told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." Carruthers told Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." Carruthers said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by Carruthers, Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because Carruthers had threatened him and his family. According to Alfredo Shaw, one of Carruthers' investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, Carruthers called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and Carruthers. Carruthers also called attorney AC Wharton who testified that he was initially retained by Carruthers' mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that Carruthers had said he was not going to hire an attorney or post bond. Finally, Carruthers called an administrative assistant from the Shelby County jail who testified that jail records, [sic] indicated that Alfredo Shaw was not in the law library at the same time as Carruthers in either February or March of 1994. According to jail records, Alfredo Shaw was in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with Carruthers. The record reflects that Alfredo Shaw came forward and provided a statement to police on March 27, 1994 and that the indictments were returned on March 29, 1994.

(ECF No. 228-31 at PageID 32942–49 (quoting *State v. Carruthers*, 35 S.W.3d 516, 524–30 (Tenn. 2000) (footnotes omitted).)

The jury found Petitioner guilty of three counts of first-degree murder for killing Marcellos Anderson, his mother Delois Anderson, and Frederick Tucker and then sentenced him to death for the 1994 murders. *See Carruthers v. State*, 145 S.W.3d 85, 88 (Tenn. Crim. App. 2003). Both state and federal courts have reviewed Petitioner's conviction and upheld it each

8

time.  Petitioner filed a direct appeal of his convictions in the state appellate courts.  (*See* ECF

Nos. 195, 211, 214.)  And then he sought post-conviction relief in state court and habeas relief at

the federal district court and appellate levels.[2]  (*See* ECF Nos. 195, 211, 214.)

In September 2025, the TSC set an execution date for May 21, 2026, at 10:00 a.m.  (*See*

ECF No. 227-4.)  It then remanded the case to the Criminal Court of Shelby County to determine

Petitioner's "present competency" to be executed under the procedures in *Van Tran v. State*, 6

S.W.3d 257 (Tenn. 1999) and the standard in *State v. Irick*, 320 S.W.3d 284 (Tenn. 2010).  (*See*

*id.*)  The TSC directed Petitioner to petition no sooner than February 11, 2026, and no later than

February 13, 2026, to "ensure the determination of Mr. Carruthers' competency to be executed

occurs in close proximity to his scheduled execution date."  (*Id.* at PageID 20753.)

In his petition ("Incompetency Petition") that followed, Petitioner's counsel

acknowledged that Petitioner was aware of the execution date and that the State has set the date

because of his murder convictions.[3]  (*See* ECF No. 227-5 at PageID 20758.)  Counsel, however,

asserted that Petitioner suffers "gross delusions" because of brain damage and schizoaffective

disorder bipolar type.  (*Id.* at PageID 20758–59.)  And Counsel asserted that these delusions

interfere with Petitioner's ability to rationally understand the execution and the reasons why he is

being executed.  (*Id.* at PageID 20759.)  According to his counsel, Petitioner's awareness of a

link between his crime and the punishment is "so far removed from reality that the punishment

can serve no proper purpose."  (*Id.* at PageID 20768 (quoting *Panetti v. Quarterman*, 551 U.S.

---

[2] The evidence presented at trial and information about Petitioner's state court appeal and initial
habeas petition can be found in the Court's order denying habeas relief.  (*See* ECF No. 195.)
[3] The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")
addressing "second or successive" petitions, *see* 28 U.S.C. § 2244(b), do not apply to the instant
incompetency to be executed claim, which has only recently become ripe.  *See Panetti v.
Quarterman*, 551 U.S. 930, 945 (2007).

930, 960 (2007)).

Counsel further claimed that Petitioner believes a "cabal of corrupt judges, prosecutors, and defense attorneys have conspired to secure his conviction and death sentence" and that they are "essentially playing a game of chicken with him" to avoid payment of his claims for financial damages against the corrupt state actors. (*Id.* at PageID 20760–61.) Counsel asserted that Petitioner believes his counsel conspired against him and that he speaks of his imminent release. (*Id.* at PageID 20761–63.) And Counsel argued that Petitioner is obsessed with "taking the bar cards" of lawyers who committed "fraud on the court" related to Alfredo Shaw's testimony without understanding that "sanctioning of counsel will not save his life." (*Id.* at PageID 20764–65.) Counsel also addressed Petitioner's belief that his calls are illegally wiretapped. (*Id.* at PageID 20765–66.)

Attached to the Incompetency Petition was a February 11, 2026, report from psychiatrist Bhushan Agharkar. Dr. Agharkar's report is based on (1) his evaluation of Petitioner in 2011;[4] (2) Tennessee Department of Corrections medical and institutional records; (3) recorded telephone calls from October 1, 2025, and January 22, 2026; (3) voicemails that Petitioner left with his attorney's office from December 1, 2025, until January 27, 2026; and (4) the declarations of Petitioner's counsel, a paralegal, and an attorney with another Federal Public Defender's office. (*See id.* at PageID 20802–11.)

The state trial court held a four-day hearing in March 2026 over whether Petitioner is competent for execution. *See State v. Carruthers*, No. W1997-00097-SC-DDT-DD, 2026 WL 1257769, at *7 (Tenn. May 7, 2026), *pet for cert. docketed* (U.S. May 14, 2026). Petitioner

---

[4] Agharkar determined that Petitioner was not competent to represent himself at the 1996 trial, as an advocate at his capital sentencing hearing, or to waive mental health claims in the post-conviction proceedings. (*Id.* at PageID 20802.)

testified, as did his former counsel Richard Tennent, Houston Goddard, and Kelley Henry, paralegal Satyra Deaver, Attorney Casey Swanson, and Agharkar, and he introduced forty-six exhibits. *See id.* at *9. The State relied on the testimony of court-appointed expert Dr. Thomas Schacht. *Id.* The trial court made findings of fact and concluded that Petitioner was competent to be executed. (*See* ECF No. 228-15 at PageID 30958–79.) On appeal, the TSC affirmed the trial court and denied Petitioner's request to stay his execution. (*See* ECF No. 228-31.)

Petitioner petitions here for habeas corpus relief, asserting that he is incompetent to be executed based on *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Madison v. Alabama*, 586 U.S. 265 (2019). (*See* ECF No. 225; *see also* ECF No. 226 at PageID 20529; ECF No. 233.) Respondent responded in opposition. (ECF No. 235.) Petitioner replied. (ECF No. 237.)

Petitioner also sued in the United States District Court of Middle District of Tennessee and moved to stay his execution over claims about the evidence in his murder trial. On May 15, 2026, that court denied a stay of execution, *see Carruthers v. Skrmetti*, No. 3:26-cv-00540, 2026 WL 1365275 (M.D. Tenn. May 15, 2026), and Petitioner has appealed. *See Carruthers v. Skrmetti*, No. 26-5433 (6th Cir. May 15, 2026). On May 19, 2026, the United States Supreme Court denied a stay of execution and a petition for writ of certiorari. (*See* ECF No. 238-2.) *Carruthers v. Tennessee*, No. 25-7377, 2026 WL 1392958 (U.S. May 19, 2026).

Petitioner has also moved under 28 U.S.C. § 2244 seeking leave to file a second or successive habeas petition in the United States Court of Appeals for the Sixth Circuit. *See In re: Tony Carruthers*, No. 26-5434, Doc. 1 (6th Cir. May 16, 2026).

## **THE COMPETENCY HEARING**

Because the trial court's evaluation of Petitioner and the evidence presented at the

competency hearing and the TSC's evaluation of the trial court are central to the dispute here, the

Court will take the time to recount the testimony and evidence presented at the hearing.

Fortunately, the TSC accurately summarized the evidence presented at the competency hearing.

*See Carruthers*, 2026 WL 1257769, at *9–19.  (*See* ECF No. 228-31 at PageID 32954–66.)  The

Court will therefore rely on the TSC's retelling of the hearing here.

Attorney Tennent represented Petitioner from 2018 through 2023.  (ECF No. 228-31 at

PageID 32954.)  He worked as a Federal Public Defender in the Capital Habeas Unit, and he

prepared Petitioner's 2019 response to the State's motion to set an execution date.  (*Id.*)

Attorney Tennent spoke with Petitioner about seventy-five times a year over the phone and met

with him twice in person.  (*Id.*)  He last spoke with Petitioner in 2023.  (*Id.*)

Attorney Tennent testified to the many "false beliefs or delusions" that he believed that

Petitioner maintained

> In Mr. Tennant's layman's view, Mr. Carruthers is fixated on multiple false
> beliefs or delusions. As examples, he cites Mr. Carruthers' belief that he is under
> constant surveillance and that his telephone calls are being monitored by everyone
> involved in the case. According to Mr. Tennant, Mr. Carruthers falsely believes he
> is entitled to significant compensation for each of these ethical violations based on
> Tennessee Rule of Professional Conduct 3.3.

> Mr. Tennent testified that Mr. Carruthers is also fixated on Alfredo Shaw, a
> defense witness at trial who claimed Mr. Carruthers confessed to him in jail. He
> said Mr. Carruthers mentioned Mr. Shaw in every conversation. He added that Mr.
> Carruthers believes everyone knows he did not commit these crimes and was
> framed by Mr. Shaw. Further, Mr. Carruthers believes Mr. Shaw is a liar who gave
> false testimony and is a paid government informant. . . . Mr. Tennent said Mr.
> Carruthers' beliefs about Mr. Shaw are "far from delusional," explaining that many
> related issues were litigated in the post-conviction proceedings. . . . Mr. Tennent
> said Mr. Carruthers believed the parties responsible for the fraud would be arrested,
> and he would be released. . . .

> During re-direct examination, Mr. Tennent recalled that Mr. Carruthers
> believed some of his former male counsel had a sexual interest in him and had
> "made passes at him." Finally, when asked if he believes Mr. Carruthers believes
> the State does not wish to execute him, Mr. Tennent responded that he is convinced
> Mr. Carruthers thinks "this is all a sham . . . to coerce an *Alford* plea."

(*Id.* at PageID 32954–55.)  But Attorney Tennent clarified and softened some of his statements

on cross-examination.

> On cross-examination, Mr. Tennent clarified that when he states that Mr. Carruthers is delusional or displays paranoia, Mr. Tennent means Mr. Carruthers believes things that Mr. Tennent believes are not true. As to Mr. Carruthers' belief that his calls from prison are being monitored, Mr. Tennent acknowledged his awareness of a class action lawsuit against Global Tel Link involving improper recording of attorney-client calls, adding that such lawsuits can result in monetary judgments. Mr. Tennent also agreed that on approximately six occasions he likely reinforced Mr. Carruthers' belief that their conversations were being recorded. . . .

> Regarding Mr. Carruthers' belief that he is being illegally incarcerated, Mr. Tennent agreed that, stated differently, Mr. Carruthers has a deeply held belief he is innocent of the crimes for which he was convicted. Although Mr. Tennent believes Mr. Carruthers thinks this is a "giant farce" and that the death penalty is only being used to coerce him into entering a plea, Mr. Tennent agreed Mr. Carruthers has never disputed that he has been convicted of these crimes. Mr. Tennent agrees that it seems Mr. Carruthers believes if he files complaints with the Board of Professional Responsibility (BPR) against the attorneys involved in the fraud, the BPR will investigate, and he will be immediately released and exonerated.

(*Id.* at PageID 32955.)  On recall, Attorney Tennent testified that he spoke with Petitioner about

an *Alford* plea in 2019, 2020, and 2021.  (*Id.* at PageID 32963.)  According to Attorney Tennent,

Petitioner was angry that his co-defendant took an *Alford* plea after his conviction was

overturned because Petitioner believed his co-defendant to be innocent and his plea to therefore

be fraudulent.  (*Id.* at PageID 32963–64.)  "Mr. Tennent testified that . . . Mr. Carruthers believes

all of the conspirators know he is not guilty; however, they are . . . trying to avoid paying [him]

$3.3 million . . . and . . . losing their law licenses by forcing him to take a plea. . . . [or] hav[ing]

him found incompetent." (*Id.*)  Attorney Tennent also testified that he thinks that Petitioner does

not believe the State is serious about executing him.  (*Id.* at PageID 32964.)

Attorney Kelley Henry, another Federal Public Defender in the Habeas Capital Unit,

supervised Attorney Tenant and worked on Petitioner's case in 2019.  (*Id.* at PageID 32956.)

She took over direct representation of Petitioner in 2020.  (*Id.*)  She reassigned the case to

13

Petitioner's current counsel in 2025. (*Id.*) She met with Petitioner once in person, a meeting during which Petitioner only wanted to discuss Alfredo Shaw. (*Id.*) And she spoke with Petitioner on the phone every two months while she represented him. (*Id.*) Attorney Henry also described her experiences with Petitioner and his beliefs.

> Ms. Henry said that, due to the perceived federal wiretap, the calls began with Mr. Carruthers announcing himself and informing the listeners they owe him $3.3 million dollars for listening to his attorney-client calls. Ms. Henry said Mr. Carruthers regularly left voicemails for her with some variation on the theme of Mr. Shaw, 'fraud on the court,' and writing to the BPR. She said that at some point, Mr. Carruthers brought the idea of federal income taxes into the "delusion," informing Ms. Henry she should report to her superiors that confidential informants are not paying federal income taxes. . . .

> Ms. Henry recalled that Mr. Carruthers told her she could take certain actions that would result in his immediate release. For example, to secure his immediate release, she could report his former counsel to Sandy Garrett at the BPR; inform John Bledsoe, Assistant Attorney General and "officer of the court" of the fraud on the court; and/or inform the IRS that confidential informants do not pay their income taxes on payments made by prosecutors.

(*Id.*) On cross-examination, Attorney Henry noted that Petitioner "has always maintained his innocence." (*Id.*)

Satyra Deaver was the chief paralegal in the Federal Public Defender's Office and worked on Petitioner's case since 2008. (*Id.* at PageID 32957.) "In her layperson view, Mr. Carruthers exhibits various paranoias including: his food and toothpaste are being poisoned; TDOC employs homosexuals who are against him; his cell door is monitored by a camera 24/7; the phones have wiretaps; and a named federal counsel has sexually transmitted infections (STIs)." (*Id.*) Deaver echoed Attorney Tennent in testifying that Petitioner is fixated with "taking the bar cards of every attorney and judge who has wronged him," and she also stated that he is fixated with "promoting hashtags; and with the number 3.3." (*Id.*) The hashtags that she claims that he seeks to promote all relate to freeing Petitioner or Alfredo Shaw's perceived fraud. (*Id.*) In her view, Petitioner promotes these hashtags to secure his freedom and the money he

14

believes he is owed.  (*Id.*)

Deaver also presented communications from Petitioner related to the "fraud on the court," Alfredo Shaw, and "Shaw's purported failure to pay income taxes on monies paid to him as a confidential informant."  (*Id.*)  Deaver stated that Petitioner expressed no concern about his execution and had not mentioned it in recent calls.  (*Id.*)

On cross-examination, Deaver agreed that Petitioner had not disputed the murders, his conviction, or his death sentence, but she also stated that they had not discussed them either. (*Id.*)  She also agreed that Petitioner had been trying to overturn his conviction since his trial and that pushing hashtags can create results in exoneration campaigns.  (*Id.*)

Attorney Casey Swanson is a Federal Public Defender from Detroit who received voicemails from Petitioner referencing wiretaps and $3.3 million or trillion.  (*Id.*)  At first she ignored the messages, but then, she spoke with Petitioner in 2022.  (*Id.* at PageID 32957–58.) From then on, Petitioner "routinely talked about wiretaps, the $3.3 million, Alfredo Shaw, tax evasion, and hashtags."  (*Id.* at PageID 32958.)  She would send Petitioner's voicemails to Deaver.  (*Id.*)

Dr. Bhushan Agharkar is a board-certified psychiatrist from Atlanta, Georgia.  (*Id.*)  His testimony at the competency hearing was extensive, and the TSC summarizes it well.

> Mr. Carruthers' former counsel first contacted Dr. Agharkar in 2008 initially seeking assistance in improving communication with Mr. Carruthers and ultimately seeking an evaluation of Mr. Carruthers' competency to stand trial (post-trial) and his competency to waive certain rights. In 2011, Dr. Agharkar conducted an in-person interview that lasted approximately three and a half hours. In the fall of 2025, counsel asked Dr. Agharkar to update his 2011 interview by conducting a new psychiatric interview or evaluation related to a January 2026 hearing on Mr. Carruthers' pro se fingerprint petition and his competency to proceed pro se in those proceedings. Dr. Agharkar attempted to interview Mr. Carruthers on two occasions; however, Mr. Carruthers refused to meet with him. Dr. Agharkar prepared a report for the January 2026 hearing, and subsequently, prepared an updated report, which was attached to Mr. Carruthers' petition to be declared incompetent to be executed.

15

Dr. Agharkar recalled the 2011 interview and his diagnosis of schizoaffective disorder, bipolar type. Turning to the 2026 evaluation, Dr. Agharkar again noted that he was unable to interview Mr. Carruthers despite his preference to interview Mr. Carruthers to talk to him about his symptoms. He said, in the absence of an interview, he obtained that kind of information from other sources. Dr. Agharkar included a comprehensive list of the data he reviewed, noting that he primarily relied on the declarations, the handwritten letters, the recorded calls and voicemails, and the TDOC medical records. Dr. Agharkar identified specific TDOC records spanning from 2011 through 2023 that, in his view, support his diagnosis. Upon reviewing these additional materials, Dr. Agharkar said his diagnosis remains the same.

As to the delusions, Dr. Agharkar said Mr. Carruthers believes there is a conspiracy against him. According to Dr. Agharkar, Mr. Carruthers believes his attorneys are trying to get him killed; that everything is working against him; and that there is a "fraud upon the court" based on ethical violations and that as a result of the ethical violations he is entitled to monetary damages. When asked to clarify his understanding of Mr. Carruthers' understanding of the purpose of his execution, Dr. Agharkar said that Mr. Carruthers believes the State's reason for executing him is to deprive him of remuneration for his claims. He explained that Mr. Carruthers believes the State is playing a "game of chicken" in order to force him to settle his monetary claims or to deprive him of his money. Dr. Agharkar described another delusion about the number 3.3, which is based on ethical guideline 3.3 and relates to the amount of money to which Mr. Carruthers believes he is entitled to receive for every ethical violation.

Dr. Agharkar also generally discussed Mr. Carruthers' delusions about federal taxes owed by informants; poisoning of his food; constant monitoring in prison; his former counsel's STIs; social media hashtags; a wiretap; and a possible connection between Judge Joe Brown withdrawing from the mayor's race and Governor Lee possibly listening to his calls. (521) When asked how these delusions relate to whether Mr. Carruthers has a rational understanding of the connection between his conviction, his sentences, and his execution, Dr. Agharkar testified that based on the assessment of everything he had reviewed, Mr. Carruthers does not have a rational connection and rational understanding between why he was convicted and the execution. Instead, according to Dr. Agharkar, Mr. Carruthers thinks that the vast conspiracy is keeping him from the money he is owed and that he will be executed or forced into a settlement of some kind. Dr. Agharkar testified he was addressing only the rational component of the Panetti standard and was not testifying that Mr. Carruthers lacks awareness of his conviction and death sentence.

On cross-examination, Dr. Agharkar said that in his observations of Mr. Carruthers during the competency hearing, Mr. Carruthers did not appear to be in a manic state at this time; did not appear to be psychotic; and showed no signs of psychosis.

16

Dr. Agharkar also acknowledged that Mr. Carruthers was able to communicate about problems related to his housing during the week of the hearing and was able to communicate with counsel. When asked about his direct testimony that Mr. Carruthers believes his attorneys are trying to kill him, Dr. Agharkar agreed that Mr. Carruthers does not believe his attorneys are literally trying to kill him. Instead, he means his attorneys are not raising issues he believes have merit and could result in his exoneration. However, Dr. Agharkar would like the ability to ask Mr. Carruthers more about the meaning.

During redirect examination, Dr. Agharkar compared Mr. Carruthers with Mr. Panetti. Dr. Agharkar had evaluated Mr. Panetti during Mr. Panetti's case. Dr. Agharkar testified that based on his writings, Mr. Carruthers does not believe "this to be real" because he keeps talking about going free, even as recently as the January 2026 hearing, and he continues to believe his execution is a way to force him to settle or to stop him from getting the money he is owed. Thus, Dr. Agharkar opined that, like Mr. Panetti, Mr. Carruthers' understanding was compromised by this belief that was a delusion. Dr. Agharkar, who evaluated Mr. Panetti, acknowledged that he was able to conduct an interview with Mr. Panetti regarding his competency-to-be-executed claim.

At the close of recross examination, the trial court questioned Dr. Agharkar about his testimony. When asked if Mr. Carruthers links his compensation to his wrongful conviction, Dr. Agharkar responded that Mr. Carruthers believes he is entitled to compensation because of his lawyers' ethical violations. When asked where he got that information, Dr. Agharkar said he talked to Mr. Carruthers about the compensation in 2011, but he added that the amount had obviously increased. The trial court then questioned Dr. Agharkar about his testimony concerning Mr. Carruthers' rational understanding for purposes of the competency standard. Dr. Agharkar opined that Mr. Carruthers believes he will be executed to prevent him from getting the money. Dr. Agharkar added, "I think it's two things. One is that the execution will not go forward because the whole point of it is to get him to settle for money, but that if he were to be executed, it would be to stop him from getting the money." Noting again that Dr. Agharkar has not interviewed Mr. Carruthers about this belief, the trial court pointed out that, despite the importance of this testimony, Dr. Agharkar did not mention in his report provided to the trial court that Mr. Carruthers believes he is going to be executed to prevent him from getting the money. The court took a recess to allow Dr. Agharkar the opportunity to review his report again to see if any declaration or any evidence supports this testimony. When court reconvened, Dr. Agharkar said he could not find it in any declaration or in either of his reports. Dr. Agharkar apologized if he misspoke or "took that too far."

Next, Dr. Agharkar agreed the court was required to focus on Mr. Carruthers' current competency. Dr. Agharkar testified, "I think [Mr. Carruthers] would understand why the State says they are going to execute him for the

conviction of murder. I think he would say that. Again, I'm so limited because I can't talk to him. But yes, I believe he understands that from his writings." When the court reminded Dr. Agharkar he testified on direct that Mr. Carruthers does not have a rational understanding of the connection, Dr. Agharkar said "[Mr. Carruther's] belief that it's a sham that it's about the money and that the execution is to get him to settle, you know, to bludgeon him into basically taking a deal because he believes he's going to go free and everyone seems to know that['s] his belief. So I believe that's where the execution comes in that this is not real." When the court asked where Dr. Agharkar got that information, Dr. Agharkar said "[f]rom letters he's sent to people" and from Richard Tennent's declarations. (718) At the court's request, Dr. Agharkar read the following excerpt from Mr. Tennent's declaration:

> Mr. Carruthers sincerely believes things that are not true. He is delusional. Based on his false and delusional beliefs, Mr. Carruthers has created an illogical intellectual construct that explains why the State is pretending to plan his execution. Mr. Carruthers believes that his conviction and impending execution are all part of an elaborate bluff by the State. Mr. Carruthers knows that the State recognizes that he is innocent. He knows the State is trying to pressure him into accepting an Alford plea for time served. Despite the obvious allure of being released from prison and avoiding execution, Mr. Carruthers states that he is unwilling to accept the State's imaginary offer because to do so would extinguish his claims to millions of dollars in damages that he believes he is entitled to because of various illegal and unconstitutional acts by the State.

When the court expressed concern about the timing of the statement [for purposes of assessing present competency], Dr. Agharkar said he was unsure when the statement was made, adding that Mr. Tennent did not put a date on it. Upon being reminded that Mr. Tennent's representation ended in 2023, the court asked, "But it's your belief that you can sit here and testify and tell me he still thinks that today?" Dr. Agharkar responded, "I'm limited because I can't interview him about it so I have to see if any of that – if he's continuing to write about the same types of things, from my opinion he would continue to believe them, but I can't know for sure since I can't interview him."

The trial court then turned to Dr. Agharkar's evaluation of Mr. Carruthers' competency to be executed contained on page 7 of his final report dated March 5, 2026, and Dr. Agharkar read the following portion into the record:

> Mr. Carruthers suffers from many persistent debilitating delusions that compromise his perceptions of that which is going on around him and render his understanding of the relationship between his conviction and his execution irrational. Mr. Carruthers is paranoid about his lawyers, their role in what he perceives is the injustice of

his case, and their role in setting his execution date. He illogically believes that execution date notwithstanding, he is about to be released from custody as soon as various improbable actors (the Board of Professional Responsibility, the Attorney General's Office, the Department of Justice, Governor Bill Lee, and "Kim Kardashian mama") agree to accomplish various improbable acts. These actions include making his hashtag go "viral," or posting Judge Addison's order authorizing the release of information about Alfredo Shaw, each of which Mr. Carruthers [believes] will result in his immediate release. Finally, his paranoia about the conspiracy against him has evolved into a belief his continued incarceration is to prevent him from receiving the 3.3 or 33.3 million rightly due to him for exposing various bad acts (the nonpayment of taxes by criminal informants nationwide, his claims against TDOC, and his entitlement because of the illegal wiretap on his attorney's phone). Each of these delusions interlocks or overlaps with the other combining synergistically to prevent a rational understanding of the State's rationale for his execution, *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007).

As to his remarks about Mr. Carruthers' belief that his continued incarceration is to prevent him from receiving the $3.3 or $33 million due to him for exposing the bad acts, Dr. Agharkar indicated he learned this from Mr. Tennent's declaration but also from the letters Mr. Carruthers writes about the money. When asked how he was linking Mr. Carruthers' beliefs about the money to his execution, Dr. Agharkar said he thinks he is relying on Mr. Tennent's declarations. Dr. Agharkar reiterated Mr. Carruthers' understanding that the execution is a bluff in order to get him to settle or not get his money. Dr. Agharkar said that even though he does not know when Mr. Carruthers expressed the beliefs cited by Mr. Tennent, the diagnosis remains unchanged. Turning to Mr. Carruthers' paranoia about his attorneys, the court asked Dr. Agharkar "what does that have to do with him understanding the rationale for his execution?" Dr. Agharkar responded that he is not sure he made that link.

The trial court reminded Dr. Agharkar that in his February 11, 2026 report, he said there are three reasons to have a competency hearing, then in his March 5, 2026 report, Dr. Agharkar gave three reasons he believes Mr. Carruthers meets the Panetti standard: Mr. Carruthers' paranoia; his belief that his execution was a sham; and his belief in his immediate release. Focusing on the third reason—his immediate or imminent release—Dr. Agharkar cited a January 2026 telephone call during which Mr. Carruthers believed he was going to be released after the hearing on his fingerprint petition. (728-729) When the trial court surmised that Mr. Carruthers likely hoped he was going home after the hearing, the court again asked for the basis of Dr. Agharkar's opinion. Dr. Agharkar said, "I don't know what he believes today as he sits here now. I can't talk to him. He won't talk to me so that I could give you that information so the best I can do is January."

Finally, the court returned to the following quote from Dr. Agharkar's report: "Each of these delusions interlocks or overlaps with the others combining synergistically to prevent a rational understanding of the State's rationale for his execution." The court asked if this sentence means that each of the three things Dr. Agharkar cites as reasons he believes Mr. Carruthers meets the *Panetti* standard are not good enough alone, but somehow the combined effects of them are greater than their sum. Dr. Agharkar responded, "It means greater than their sum, yes." Then the court asked, "So one plus one plus one doesn't equal three, it equals three three three three three three?" Dr. Agharkar answered, "or it means five. I mean, it's more than the sum, yes."

(*Id.* at PageID 32958–32962.)

The State called Dr. Thomas Schacht, a clinical and forensic psychologist. (*Id.* at PageID 32962.) While discussing rational understanding under *Panetti*, he noted that "it is perilous to rely solely on your own point of view as an observer without having access to the understanding and point of view of the person articulating whatever is being said." (*Id.* at PageID 32962–63.) Petitioner refused to speak with Dr. Schacht for an evaluation. (*Id.*) But when Dr. Schacht visited Petitioner's prison cell, Schacht noted that Petitioner was "well-groomed and appear[ing] clean," and his cell was "very well-organized and clean." (*Id.* at PageID 32963.) After reviewing Petitioner's November 2025 pro se pleading and some of his phone calls, Schacht concluded that the pleading "did not look to be the product of a mind that is cognitively impaired" and that it was "'organized, reasonably well-written' and seemingly void of delusional material." (*Id.*)

Petitioner's counsel cross-examined Schacht and asked him about an excerpt from his report which stated "[t]o be considered for classification as a delusion, a false belief must be held and maintained with subjective sincerity. . . . False beliefs propagated insincerely can be observed in the context of goal-directed manipulations, con schemes, gaslighting, vindictive harassment, and malignant scripts and interpersonal agenda characteristic of severe personality

disorders." (*Id.*)  He explained that "in the absence of an interview, assessing the sincerity of

Mr. Carruthers' beliefs is extremely difficult because you have no basis to assess the sincerity."

(*Id.*)  Schacht did not diagnose Petitioner.  (*Id.*)

Attorney Houston Goddard represented Petitioner from January 2022 to Fall 2023 while

he was a Federal Public Defender.  (*Id.* at PageID 32964.)  Goddard spoke with Petitioner twice

per week and recalled a specific conversation with him discussing an *Alford* plea.  (*Id.*)  He states

that Petitioner told him "the State had offered him an Alford plea, and if accepted, he would be

released that day; however, he would not be able to claim the $3.3 million owed to him due to

the wiretap."  (*Id.*)  And he told him that "the execution was a ploy to get him to take the Alford

plea."  (*Id.*)  Goddard did not believe Petitioner thought the State was serious about executing

him.  (*Id.*)

On cross-examination, Goddard agreed that Petitioner did not dispute his murder

convictions or death sentences.  (*Id.*)  He only insisted on his innocence and disputed the

credibility of witnesses.  (*Id.*)  Goddard also recognized that he did not represent Petitioner at a

time when the execution date had been set, so he did not review Petitioner's statements about the

execution.  (*Id.*)

Petitioner also testified at the competency hearing, and the TSC's summary of his

testimony is useful here.

> Current counsel, Amy Harwell, informed the trial court that she planned to
> call Mr. Carruthers as a witness. After discussing potential issues and options
> should Mr. Carruthers choose not to testify, the trial court brought Mr. Carruthers
> back into the courtroom. The trial court informed Mr. Carruthers that counsel
> wanted to question him as a witness. When Mr. Carruthers asked, "[a] witness for
> who?," the court explained that this was his competency petition and that counsel
> wanted to call him as a witness. Mr. Carruthers was sworn and questioned.
>
> The trial judge informed Mr. Carruthers it would permit counsel to call him
> as a witness, explaining that he has no Fifth Amendment right to remain silent at

this juncture. Mr. Carruthers asked the court to appoint independent counsel for him, which the court declined. The court further declined Mr. Carruthers' request to appoint the BPR or "at least notify them of this ethical problem." The court further explained that counsel called him to help his case rather than to be a witness against himself, adding "[y]ou have an opportunity to speak."

Ms. Harwell asked Mr. Carruthers if his first degree murder conviction is a sham. Mr. Carruthers responded, "I've never stated my case was a sham. I've been transported for six days in shackles and restraints with some of the highest security [by] TDOC and the Sheriff Department. I've never thought this was a sham." Ms. Harwell repeated the same question to which Mr. Carruthers responded, "I've tried to answer ma'am. I have mittimus that keeps me in shackles and restraints where I cannot leave any prison at any time because I've been convicted. I've never thought that people tote me around with restraints and guns was a sham. Never thought that ever." Ms. Harwell next asked Mr. Carruthers why the State is going to execute him. Mr. Carruthers described how false evidence provided by Mr. Shaw was used against him to obtain his conviction.

Ms. Harwell asked Mr. Carruthers what all of the information about Mr. Shaw and CrimeStoppers had to do with $3.3 million. Mr. Carruthers explained that ABA Standard 3.3 and Tennessee Rule of Professional Conduct 3.3 prohibit attorneys from participating in fraud, and therefore, the various attorney participants who aided Alfredo Shaw are liable under their legal malpractice policies when a notice of claim is submitted "just like car insurance." When Ms. Harwell asked Mr. Carruthers if he had submitted "a lot of notice[s] of claims," Mr. Carruthers explained that he filed a notice before his post-conviction hearing asking that all the attorneys called to testify at the hearing be required to submit their legal malpractice carrier and the policy limits. Mr. Carruthers added, "[j]ust having a notice of claim is not a claim. You have to put a monetary value on [the claim]. And the number is the same one that gets them disbarred, 3.3." Ms. Harwell again asked if he had submitted "a lot of notice[s] of claims." Mr. Carruthers responded that no attorney had provided their legal malpractice information although ethically bound to do so, and none had submitted a claim to their insurance company. Ms. Harwell asked if the $3.3 million is owed to Mr. Carruthers or to someone else. Mr. Carruthers responded that, "[i]t's owed to the person who's been injured."

Continuing with the issue of notice of claims, Mr. Carruthers used the example of his DNA claim. Mr. Carruthers said he filed a notice of claim when he realized DNA evidence had been withheld in violation of his constitutional rights, adding that because he had been injured money was owed to him. When asked the identity of the attorneys, Mr. Carruthers identified three or four attorneys by name, and he referred Ms. Harwell to his "fraud upon the court" packet, which details those involved in the Alfredo Shaw fraud. Mr. Carruthers further explained that his counsel's office had compiled the packet and submitted the packet to the Tennessee Attorney General and the Tennessee Supreme Court. Mr. Carruthers believed his federal habeas corpus counsel failed to submit the packet in the federal proceedings.

22

Mr. Carruthers said that, among other things, the packet asserted then-Assistant District Attorney John Campbell committed fraud upon the court throughout the post-conviction proceedings when he told Charlie Ray that Alfredo Shaw had never been an informant and failed to inform other named authorities.

When asked if he really wanted to "take the bar cards" of all of the attorneys involved in the fraud, Mr. Carruthers responded that the ethical investigations and disbarment could begin with Ms. Harwell and continue, like dominos, until each attorney involved in the fraud is disbarred. Ms. Harwell asked, "If all of the attorneys fall the way you want them to, will you be executed?" to which Mr. Carruthers responded, "I hope not."

Ms. Harwell asked Mr. Carruthers to recall Mr. Tennent's testimony that Mr. Carruthers believes the State is playing a "game of chicken" with him; that this whole thing is a "sham"; and that the State is trying to coerce him into taking an Alford plea. Mr. Carruthers said those are Mr. Tennent's words, not his words. When asked to give "his words," Mr. Carruthers said, "I've been trying to get exonerated." When Ms. Harwell asked if the State was trying to execute him to keep him from getting his money, Mr. Carruthers told her to ask the State. Mr. Carruthers added that these conversations came from counsel's mouth, not his mouth, adding that he had never heard counsel ask the State, "Are y'all wanting to execute Mr. Carruthers knowing that y'all committed fraud?"

On cross-examination, Mr. Carruthers agreed that he had been raising the "fraud" issue for over thirty years to anyone who would listen. Mr. Carruthers was then asked, "And you believe sitting here today that if you are executed, it will be because you were wrongfully convicted based upon this false information; is that fair?" to which Mr. Carruthers responded, "Yes."

(*Id.* at PageID 32964–66.)

As the Court turns to its analysis, it begins with the applicable legal standards.

## ANALYSIS

### I.    Legal Standard for Stay of Execution

Petitioner seeks a stay of his execution.  He asserts that the TSC erred when it affirmed the trial court's determination that he is competent to be executed.  Federal courts have the authority to stay an execution under 28 U.S.C. § 2251(a)(1).  The exercise of stay jurisdiction under § 2251 is within the sound discretion of a federal court.  *See McFarland v. Scott*, 512 U.S. 849, 858 (1994).  Courts apply a four-factor test to determine whether to grant a stay: 1) whether

23

there is a likelihood the petitioner will succeed on the merits of his claim; 2) whether there is a likelihood the petitioner will suffer irreparable harm absent a stay; 3) whether the stay will cause substantial harm to others; and 4) whether the stay would serve the public interest. *See Bedford v. Bobby*, 645 F.3d 372, 375 (6th Cir. 2011) (quoting *Workman v. Bell*, 484 F.3d 837, 839 (6th Cir. 2007)).

The State's interest in finality grows weightier as an execution date approaches, and the Supreme Court and the Sixth Circuit have counseled against last-minute stays that interfere with the state's ability to carry out its sentences. *See Barr v. Lee*, 591 U.S. 979, 981 (2020) ("[L]ast-minute stays . . . should be the extreme exception, not the norm."); *see Bedford*, 645 F.3d at 375 ("[T]he last-minute nature of an application to stay execution bears on the propriety of granting relief." (citation and internal quotation marks omitted)). Because a stay is an equitable remedy, there is a strong presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits. *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004); *see id.* at 649 ("A stay is an equitable remedy, and [e]quity must take into consideration the State's strong interest in proceeding with its judgment . . . and attempt[s] at manipulation.'" (citation omitted)).

The likelihood of success on the merits is crucial to the Court's determination of the need for a stay, so the Court will next summarize the legal standards for incompetency to be executed and for habeas review.

## II.      Incompetency to be Executed

The Eighth Amendment's ban on cruel and unusual punishments prohibits the State from "inflicting the penalty of death upon a prisoner who is insane." *Ford v. Wainwright*, 477 U.S. 399, 410 (1986). In *Ford*, the Supreme Court questioned the "retributive value of executing a

person who has not comprehension of why he has been singled out and stripped of his

fundamental right to life." *Id.* at 409. Justice Marshall noted that the Eighth Amendment

prohibits executing "one whose mental illness prevents him from comprehending the reasons for

the penalty or its implications." *Id.* at 417. And Justice Powell, in a separate opinion, found that

"the Eighth Amendment forbids the execution only of those who are unaware of the punishment

they are about to suffer and why they are to suffer it." *Id.* at 422.

And then in *Panetti*, the Court elaborated on the principles in *Ford.* It distinguished a

"prisoner's awareness of the State's rationale for an execution" from a rational understanding of

it. *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007). The Court found that "[s]omeone who is

condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-

centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to

others as to be considered, at least in the colloquial sense, to be out of touch with reality. Those

states of mind, . . . , are not what petitioner contends lie at the threshold of a competence

inquiry." *Id.* at 959–60. The Court then noted that a psychotic disorder is "[t]he beginning of

doubt about competence" and that "documented mental illness that is the source of gross

delusions preventing [the prisoner] from comprehending the meaning and purpose of the

punishment to which he has been sentenced" should be considered. *Id.* at 960. Because the State

in *Panetti* ignored the significance of the petitioner's delusions and "the extent to which severe

delusions may render a subject's perception of reality so distorted that he should be deemed

incompetent," the Court remanded the case for further consideration. *Id.* at 961-962.

More recently, in *Madison*, the Supreme Court explained that the "critical question" in

deciding whether one is competent to be executed is whether a "'prisoner's concept of reality' is

'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between

[his] crime and its punishment.'"  586 U.S. 265, 269 (2019) (quoting *Panetti*, 551 U.S. at 958).

This Court next addresses the legal standards it applies for habeas review.

### III.  Standards for Habeas Review

As noted above, Petitioner asserts that the TSC erred when it affirmed the trial court's

determination that Petitioner is competent to be executed.  In other words, the TSC has addressed

Petitioner's claim on the merits.  And under 28 U.S.C § 2254(d), when a state court has decided

a claim on the merits, a federal court should only grant a habeas petition if the state court's

decision:

> (1)  was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Because incompetency to be executed is a fact-intensive inquiry, the Sixth Circuit has

examined the issue under § 2254(d)(1) because that is the standard most favorable to the

Petitioner.  *See Coe v. Bell*, 209 F.3d 815, 823–24 (6th Cir. 2000).  A state court's decision is

"contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the

Supreme Court on a question of law or "decides a case differently than" the Supreme Court has

"on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13

(2000).  "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts

of a prisoner's case" does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  *Id*. at

406.

An "unreasonable application" of federal law occurs when the state court "identifies the

correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies

26

that principle to the facts of the prisoner's case." *Id.* at 413. This application of federal law must be "objectively unreasonable" for the writ to issue. *Id*. at 409. It is not sufficient that the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("We have explained that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" (quoting *Williams*, 529 U.S. at 410)).

Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (first quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), then quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). A state prisoner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

In deciding whether to grant habeas relief, federal courts give considerable deference to state-court credibility determinations. In fact those findings are presumed to be "correct absent clear and convincing evidence to the contrary." *See Wesson v. Shoop*, 17 F.4th 700, 705 (6th Cir. 2021) (citation omitted). In habeas proceedings, federal courts do not reweigh evidence or reevaluate the credibility of witnesses. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, federal courts presume that a state court's factual findings are correct, and that presumption can be rebutted only with "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1).

The Court will now summarize the Parties' arguments before evaluating them.

27

IV.    **Summary of Arguments**

Petitioner contends that he has shown a reasonable likelihood of success on the merits and that he is entitled to *de novo* review because the TSC used a flawed legal standard from *State v. Irick*, 320 S.W.3d 284 (Tenn. 2010), which led to an unreasonable determination of facts. (ECF No. 226 at PageID 20531–33; *see also* ECF No. 237.)  He asserts that there is no dispute that he will suffer irreparable harm from execution.  (ECF No. 226 at PageID 20533.)  Petitioner argues that a stay of execution will substantially injure the State's interest and that the public's interest lies in prohibiting an unconstitutional execution.  (*Id.* at PageID 20533–35.)  Petitioner also asserts that there was no delay in presenting his habeas claim.  (*Id.* at PageID 20536–38.)

In response to the Application, Respondent only addresses the likelihood of success on the merits and the State's and public's interests as equitable considerations.  (*See* ECF No. 236 at PageID 33165–67.)  Respondent argues that this Court should apply AEDPA deference under 28 U.S.C. § 2254(d) rather than *de novo* review.  (*Id.* at PageID 33165.)  Respondent asserts that "a minimal review" of the TSC's opinion shows the reasonableness of its application of clearly established law.  (*Id.*)  He claims the TSC applied the governing standard in *Panetti*, concluding that Petitioner has "a rational understanding of the reason the State is going to execute him."  (*Id.* at PageID 33166 (quoting *Carruthers*, 2026 WL 1257769, at *21.)

Respondent disputes that the TSC unreasonably determined the facts, stating that Petitioner's position "boils down to a simple disagreement with findings made by the trier of fact who weighed the credibility of live witness testimony[.]" (*Id.*)  For these reasons, Respondent concludes that the Petition lacks merit, that Petitioner has no likelihood of success, and that he, therefore, is not entitled to the equitable remedy of a stay of execution.  (*Id.* at PageID 33167.)  Respondent also argues that the balance of equities weigh in the State's favor and that, given that

28

Petitioner committed these horrific offenses more than thirty-two years ago, there is no reason to justify further delay in the execution of the State's judgment.  (*Id.*)

Respondent do not dispute that Petitioner's execution would result in irreparable harm. *See Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("[E]xecution is the most irremediable and unfathomable of penalties; that death is different.").  And for good reason— "[t]he irreparable injury inflicted by an execution in violation of the Constitution is too obvious to require discussion."  *Miller v. Parker*, No. 3:18-cv-01234, 2018 WL 6003123, at *1 (M.D. Tenn. Nov. 15, 2018), *aff'd,* 910 F.3d 259 (6th Cir. 2018).

## V.    The Likelihood of Success on the Merits

Because the Parties are not disputing that an unconstitutional execution is an irreparable injury, their arguments focus on whether Petitioner has shown a likelihood of success on the merits of his Petition.  Petitioner contends here that the state court decision is both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  (ECF No. 226 at PageID 20531.)  And he asserts that the application of a flawed legal standard developed in *State v. Irick*, 320 S.W.3d 284, 295 (Tenn. 2010), led to an unreasonable determination of fact because the TSC's findings of fact rely on evidence of Petitioner's *awareness*, instead of his *rational understanding*.  (*Id*. at PageID 20531–32.)  For these reasons, Petitioner asserts that he is entitled to *de novo* review.

But under AEDPA, federal courts review state court rulings on the merits *de novo* only "in those rare cases" when a state court decides a federal claim in a way that is "contrary to" or an unreasonable application of clearly established Supreme Court precedent.  *Johnson v. Williams*, 568 U.S. 289, 303 (2013); *see Panetti*, 551 U.S. at 953 ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law,

29

the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim

without the deference AEDPA otherwise requires.")).

Despite Petitioner's argument that the state courts misapplied *Panetti*, this Court finds

that this is not one of the rare cases warranting *de novo* review.  The TSC noted that Petitioner

had to overcome the presumption of competence to establish his present incompetency to be

executed.  *Carruthers*, 2026 WL 1257769, at *20.  The TSC correctly set forth the standard for

incompetency to be executed.

> We review the findings and conclusions below in light of the applicable
> competency standard.  As we explained recently in *Black v. State*, No. M2000-
> 00641-SC-DPE-CD, 2025 WL 1927568 (Tenn. July 8, 2025), this Court held in
> *Van Tran* that a prisoner is not competent to be executed "if the prisoner lacks the
> mental capacity to understand the fact of the impending execution and the reason
> for it."  *Id*. at *5 (quoting *Van Tran*, 6 S.W.3d at 266).  After the United States
> Supreme Court revisited the standard for competency to be executed in *Panetti v.
> Quarterman*, 551 U.S. 930 (2007), this Court concluded that the *Van Tran*
> competency standard must be construed consistently with the *Panetti* standard as
> follows:

>> In our view, *Panetti* teaches that the test for competence to be executed
>> requires a prisoner to have "a rational understanding of his conviction, his
>> impending execution, and the relationship between the two."  Stated differently,
>> under *Panetti*, execution is not forbidden so long as the evidence shows that the
>> prisoner does not question the reality of the crime or the reality of his
>> punishment by the State for the crime committed.

> *Irick*, 320 S.W.3d at 295; *see also Black*, 2025 WL 1927568, at *5.  In *Irick*, this
> Court observed that *Panetti* "emphasizes that a prisoner seeking to establish
> incompetency may not be foreclosed from offering proof to show that a mental
> illness obstructs his rational understanding of his conviction, his impending
> execution, and the relationship between the two."  *Irick*, 320 S.W.3d at 295.  Later,
> in *Madison v. Alabama*, the Supreme Court further explained that:

>> [t]he critical question is whether a "prisoner's mental state is so distorted by a
>> mental illness" that he lacks a "rational understanding" of 'the State's rationale
>> for [his] execution.  Or similarly put, the issue is whether a "prisoner's concept
>> of reality" is "so impair[ed]" that he cannot grasp the execution's meaning and
>> purpose' or the "link between [his] crime and its punishment."

> 586 U.S. 265, 269 (2019) (quoting *Panetti*, 551 U.S. at 958-60).  Thus, the judge

30

assessing a prisoner's competency to be executed "must look beyond any given diagnosis to a downstream consequence." *Id*. at 279 (explaining that "delusions come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires"). So, the critical question is whether the inmate "can reach a 'rational understanding' of why the State wants to execute him." *Id*. at 283.

*Carruthers*, 2026 WL 1257769, at *8–9.

The TSC identified the relevant Supreme Court precedent and the applicable standard for competency to be executed under *Panetti*. *See id*. The TSC acknowledged that the standard at issue was "whether Mr. Carruthers has a rational understanding of the connection or the reason the State intends to execute him." *Id*. at *22. And it determined that "the trial court did not treat Mr. Carruthers' 'delusional belief system as irrelevant' and it did not misapply the *Panetti* standard." *Id*. The TSC noted that the trial court assessed the witnesses' credibility, assigned weight and value to the evidence before it, and then applied *Panetti* to the evidence. *Id*.

In his reply, Petitioner focuses on a portion of *Irick*, 320 S.W.3d at 295.

> [E]xecution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by the State for the crime committed.

(*See* ECF No. 237 at PageID 33170.) He contends that this is not an errant sentence, but the controlling law according to the TSC. (*Id*.) But Petitioner ignores the standard stated by the TSC and fails to recognize the TSC's inclusion of language from *Panetti* about consideration of a prisoner's delusions in determining his conception of reality and whether he "can reach a 'rational understanding' of why the State wants to execute him." *Carruthers*, 2026 WL 1257769, at *8–9. Petitioner also fails to acknowledge the TSC's specific reference to the trial court's consideration of Petitioner's delusional belief system in its analysis. *See id*. at *22.

Like Respondent's concern about "flyspecking" the state court opinion on federal review (*see* ECF No. 235 at PageID 33146), the Court agrees that Petitioner cannot take isolated

31

portions of the standard set forth by the TSC to fit a narrative that the law was unreasonably applied. "[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300 (2013) (citation omitted). Because the goal is to protect against extreme malfunctions in the state criminal system, AEDPA "instructs us to look for 'a *decision*'—not a few words or a stray thought—'that was contrary to, or involved an unreasonable application of, clearly established Federal law,'" *Rogers v. Mays*, 69 F.4th 381, 392 (6th Cir. 2025), not to create a grading system for state-court opinion writing. The TSC's statement of the law satisfies the standards in *Ford* and *Panetti*.

Petitioner compares his case to *Thompson v. Bell*, 580 F.3d 423, 436 (6th Cir. 2009), where the Sixth Circuit found that the TSC unreasonably applied *Ford*, when it determined that Petitioner's delusions were irrelevant to a competency analysis. (ECF No. 237 at PageID 33173–74.)

Unlike Thompson, the trial court did not ignore Petitioner's claims of delusions. It found that Petitioner knows he is being executed because of his three murder convictions. He simply maintains his innocence and seeks exoneration. Petitioner has not expressed that the execution is *not* tied to his conviction and sentence or other delusional beliefs about the circumstances of his execution. The TSC found that the trial court's conclusions were supported by the record.

Although Petitioner argues that the TSC equated awareness of the conviction and sentence with a rational understanding of both, the trial court continuously addressed Agharkar's reliance on sources other than the psychiatric evaluation to determine Petitioner's delusional beliefs and how those purported delusions played into its determination that Petitioner rationally understood the impending execution and its connection to his conviction. *See Carruthers*, 2026 WL 1257769, at *14–15. The arguments that Petitioner "irrationally believes he will not be

executed" (*see* ECF No. 237 at PageID 33174) go against the preponderance of the evidence. The Court will therefore apply the deferential § 2254(d)(1) analysis to determine the likelihood of success on the merits. *See Coe*, 209 F.3d at 823–24.

With this deference in mind, the Court now turns to the testimony and evidence of the witnesses at the competency hearing.

### A. Carruthers

Petitioner denied that his case or his conviction was a sham, saying:

> I've never stated my case was a sham. I've been transported for six days in shackles and restraints with some of the highest security [by] TDOC and the Sheriff Department. I've never thought this was a sham.

*Carruthers*, 2016 WL 2026 WL 1257769, at *17. (*See* ECF No. 228-21 at PageID 31924.)

When asked why the State planned to execute him, Petitioner responded that it was based "[o]n the false testimony of a[n] Organized Crime informant named Alfredo Bernard Shaw" and fraud on the court and that, without Shaw's testimony, Petitioner has an actual innocence claim. (*See id.* at PageID 31924–26, 31941–42, 31949–50.)

As for the statement the State is "playing chicken" with Petitioner, he said those are Attorney Tennent's words, and Tennent is lying—"I never had those words." (*Id.* at PageID 31939.)

Petitioner denied saying that the State tried to coerce him into an *Alford* plea saying "I've never had those words. I've been trying to get exonerated, you understand." (*Id.* at PageID 31939-40.)

When Petitioner was asked if the State was trying to kill him to keep him from getting money, he responded, "Ask them that question. You keep saying – these kind of conversations came from your mouth." (*Id*. at PageID 31950.)

When asked about a conspiracy on the part of the State, Petitioner responded that they have an ethical duty to address the phone calls about the crime and send evidence to the Board of Professional Responsibility. (*Id.* at PageID 31951.) He said, "That's the only thing I think about them." (*Id.*)

As to his purported delusion about wiretapping, Petitioner explains that, when he calls the office instead of asking for "voicemail", he say just give me the "wiretap" because they understand he wants voicemail. (*Id.* at PageID 31953.)

When Petitioner asked if the State was executing him for triple murder, not for fraud, Petitioner responded, "That's not true. . . . The Alfredo Shaw fraud happened. The lie saying he ain't no informant, that happened. You can't take that away. You can't take that part out of the equation." (*Id.* at PageID 31954.)

Essentially, Petitioner has provided the most current view of his competency through his own testimony. He denied having many of the purported delusions, asserting that these are counsel's words or misinterpretations of his statements. Even Attorney Tennent and Agharkar acknowledge that there are "kernel[s] of truth" in Petitioner's beliefs. *See Carruthers*, 2026 WL 1257769, at *10, 21. Considering those kernels of truth makes it harder for this Court to second-guess the TSC's conclusions that Petitioner's beliefs were not so far removed from reality that punishment can serve no proper purpose.

Petitioner continues to assert fraud related to Alfredo Shaw's involvement in the murder case. But he does not separate the execution from the murders and understands that he will be executed if he is not exonerated. The TSC reflected those statements in its findings that he does not believe the case is a sham and that he understands the State's plan to execute him. *Carruthers*, 2016 WL, at *22.

### B.  Agharkar

In Agharkar's report, he noted his diagnoses of schizoaffective disorder in 2011, and his earlier findings.  (ECF No. 227-5 at PageID 20802.)  Agharkar said that Petitioner "has refused to participate in previous psychiatric evaluations" in prison and that Agharkar "attempted to evaluate Mr. Carruthers, [but] he did not acknowledge my presence or engage with me in any way."  (*Id.* at PageID 20803.)  Agharkar attended a January 2026 hearing to witness Petitioner's courtroom behavior.  (*Id.*)  Because of Agharkar's inability to interview Petitioner, he relied on other sources for information.  (*Id.*)  Agharkar determined that "to a reasonable degree of medical certainty, Mr. Carruthers is not competent to be executed under the *Panetti* standard."  (*Id.* at PageID 20810.)  Agharkar relied on the "voluminous data available" though "ideally" he would interview Petitioner "to gauge his current state of mind."  (*Id.*)  Agharkar concludes that Petitioner's "paranoia" precludes such an evaluation.  (*Id.*)  Agharkar also concludes that Petitioner's "mental delusions are of the type and severity that vitiates rational understanding even though awareness of his impending execution date exists."  (*Id.*)

The TSC noted Petitioner's reliance on Agharkar's testimony.[5]  *Carruthers*, 2026 WL 1257769, at *12.  Agharkar testified that he was contacted in 2008, when counsel was seeking to improve communication with Petitioner and seeking psychiatric evaluation on Petitioner's competency to stand trial and to waive certain rights.  *Id.*  Agharkar conducted an in-person interview in 2011, that lasted three hours.  *Id.*  In the fall of 2025, he was contacted to update his evaluation related to a January 2026 hearing.  *Id.*  Agharkar attempted to interview Petitioner on two occasions, but Petitioner refused.  *Id.*  Agharkar prepared a report for the January 2026 hearing, which was attached to the state court petition.  *Id.* at *12–13.  So without a current

---

[5] (*See* ECF No. 228-19 at PageID 31413; ECF No. 228-20 at PageID 31668–740.).

interview, Agharkar's report was based on other sources of information.

Agharkar testified about Petitioner's belief that: (1) there is a conspiracy against him; (2) his attorneys are "trying to get him killed"; (3) that everything is working against him; (4) that there is a "fraud upon the court" based on ethical violations; and (5) that Petitioner is entitled to money because of the ethical violations. *Id.* at *13. Agharkar testified that Petitioner believes "the State's reason for executing him" is to keep him from recouping money for his claim and that this is a "game of chicken." *Id.* Agharkar described a delusion based on the ethical guideline 3.3 of the Tennessee Rules of Professional Conduct and Petitioner's belief that it relates to money he will receive. *Id.* Agharkar discussed delusions about taxes owed by informants, food poisoning, being monitored in prison, wiretaps, social media hashtags, and other issues. *Id.* When asked how these delusions related to Petitioner's rational understanding of his conviction, his sentence, and his execution, Agharkar concluded that Petitioner "does not have a rational connection and rational understanding between why he was conviction and the execution." *Id.* Agharkar testified that he evaluated Mr. Panetti and compared his delusions to Petitioner's concluding that Petitioner does not believe "this to be real", despite the fact that Agharkar had not conducted a recent interview of Petitioner. *Id.* at *14.

On cross-examination, Agharkar acknowledged that Petitioner did not appear manic or psychotic and otherwise showed no signs of psychosis. *Id.* at *13. Petitioner was able to communicate with counsel and to communicate issues with his housing. *Id.* Agharkar clarified that Petitioner did not believe that his counsel was literally trying to kill him, but that they are not raising issues Petitioner believes would result in his exoneration. *Id.*

When Agharkar was questioned by the trial court about rational understanding, he opined: (1) Petitioner believes that the execution will not proceed because it is being used to get

36

Petitioner to settle his monetary claims, and (2) that, if he were to be executed, it would be to

stop him from getting money. *Id.* at *14. When the trial court pointed out that his information

was not in Agharkar's report, Agharkar apologized if he misspoke, after he was given the

opportunity to review his report and could not find those beliefs in any declaration or in either of

his reports. *Id.*

Agharkar agreed that Petitioner understood that he was going to be executed for his

convictions. *Id.* Agharkar expressed that Petitioner believes the execution is "a sham" and that

it is not real. *Id.* That information was purportedly taken from Petitioner's letters and Tennent's

declarations. *Id.* Agharkar was unsure about the timing of Tennent's statement, given that his

representation ceased in 2023. *Id.* at *15.

When the court asked Agharkar, "I want to know will [Petitioner] have what counselor

says, an awareness and a rational understanding of why the State's doing what they're doing",

Agharkar responded, "My clinical opinion would be no, but I don't, I don't I have a basis for it . .

.'[c]ause I can't interview him." (*See* ECF No. 228-20 at PageID 31739.) This testimony is

consistent with the TSC's conclusions, based on its own review of the evidence, that the

evidence does not preponderate against the trial court's findings and that the trial court asked

specific questions about Petitioner's delusions and their impact on the rational understanding

prong. *Carruthers*, 2026 WL 1257769, at *22.

### C. Schacht

Petitioner also refused an interview with Dr. Thomas Schacht, a clinical and forensic

psychologist. *Id.* at *16. Schacht observed that Petitioner was "well-groomed" and appeared

calm and that his cell was well-organized and cleaned. *Id.* Schacht reviewed a pro se filing by

Petitioner and some phone calls and opined that the filing did not appear to be "the product of a

mind that is cognitively impaired." *Id.* Schacht did not opine on legal issues, but he did point out that delusion requires that a belief be held with sincerity. *Id.* He testified that, in the absence of an interview, it is "extremely difficult" to determine the basis of Petitioner's sincerity. *Id.* Schacht did not offer a diagnosis, but he opined that the "tone of his report weighed more heavily towards a personality disorder than a psychotic disorder." *Id.*

Schacht's testimony neither establishes nor negates a conclusion that Petitioner is competent. But because there is a presumption of competency, it weighs against Petitioner in showing the likelihood of success on the merits.

### D. Former Counsel

The TSC noted that testimony from Attorneys Tennent, Goddard, and Henry, was limited in that it was not recent, with the last communications being in 2023, in the fall of 2023, and in November 2025, respectively. *Id.* at *20. And the court noted that that counsel could offer only personal opinions about whether Petitioner continued to hold the same false beliefs that have been characterized as delusional. *Id.* The TSC, noting that this testimony is a necessary part of review, addressed the extensive lay testimony from former counsel about "counsels' belief about Mr. Carruthers' beliefs", including assertions that Petitioner remains "delusional", "paranoid", and fixated on false belief. *Id.*

However, given the differences between former counsel's testimony and Petitioner's own testimony, noted above, the Court finds that this testimony does little to establish that Petitioner met the standard in *Panetti*.

Giving proper deference to the trial court on its credibility determinations and the weighing of the evidence, the Court finds that the TSC's decision was not contrary to or an unreasonable application of clearly established Federal law or based on an unreasonable

38

determination of the facts in light of the evidence presented. The finding that Petitioner was competent to be executed is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded [sic] disagreement." *Richter*, 562 U.S. at 103. Petitioner has not shown the likelihood of success on the merits.[6]

## VI.     The State's Interest & The Public's Interest

While the Court has found that Petitioner has not shown a likelihood of success on the merits, it must still consider the harm to others, mainly the State, and the public interest. The public always has an interest in preventing the violation of a person's constitutional rights. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted); *see Miller*, 2018 WL 6003123, at \*1. Even so, courts must consider the State's interest in carrying out a lawful death sentence and in the finality of criminal judgments, *see Workman v. Bredesen*, 486 F.3d 896, 912–13 (6th Cir. 2007), and the fact that "the public interest is not served by ordering a stay of execution for claims that are unlikely to prevail." *Bedford v. Kasich*, No. 2:11-cv-351, 2011 WL 1691823, at \*15 (S.D. Ohio May 4, 2011). Because Petitioner has not established that he is likely to succeed in proving his incompetence to be executed and therefore has not established an Eighth Amendment violation, the public's interest does not way in his favor. The State's interest in the execution of this judgment, after more than thirty-two years, for the commission of three horrific murders is great.

---

[6] The Court recognizes that Petitioner's former counsel and Dr. Agharkar all testified to the severity of Petitioner's delusions. This testimony as well as the documentary evidence, including Petitioner's letters and phone calls, provide some support for Petitioner's position. Still, that evidence is not enough to convince the Court to second guess the trial court and TSC's analysis and their conclusion that Petitioner is competent to be executed

**CONCLUSION**

For these reasons, the Court, in its discretion, determines that Petitioner is not entitled to

the equitable remedy of a stay of execution.  The Court therefore **DENIES** the Application for a

Stay of Execution.

**SO ORDERED**, this 20th day of May, 2026.

                 s/Thomas L. Parker
                 THOMAS L. PARKER
                 UNITED STATES DISTRICT JUDGE